C. MICHAEL WITTERS *et al.*, Indiv. and Derivatively on Behalf of Midwest Transit, Inc., Plaintiffs-Appellees, v. HAL D. HICKS, Defendant-Appellant (Midwest Transit, Inc., Defendant-Appellee).

Fifth District    Nos. 5—01—0631, 5—01—0660 cons.

Opinion filed November 21, 2002.

John F. Theil and Lyndon P. Sommer, both of Sandberg, Phoenix & von Gontard, P.C., of St. Louis, Missouri, for appellant.

Brad A. Elward, of Heyl, Royster, Voelker & Allen, of Peoria, for appellees C. Michael Witters and Diane Witters.

Terry Sharp, of Law Office of Terry Sharp, P.C., of Mt. Vernon, and Sharon D. Shanahan, of Law Offices of Sharon Shanahan, of Goreville, for appellee Midwest Transit, Inc.

JUSTICE RARICK delivered the opinion of the court:

On January 21, 2000, Michael and Diane Witters filed, in the circuit court of Lawrence County, a shareholders action, individually

and derivatively, against Hal Hicks and Midwest Transit, Inc. (MWT). MWT transports United States mail under contracts obtained from the United States Postal Service. Count I was brought pursuant to section 12.56 of the Business Corporation Act of 1983 (Act) (805 ILCS 5/12.56 (West 1998)) and alleged that Hicks had engaged in fraudulent and illegal acts and that a misapplication and waste of MWT's assets had occurred. Count I requested that Hicks be removed as an officer and director and that a custodian be appointed to manage MWT. On April 20, 2000, the trial court issued a temporary restraining order (TRO), providing that no monies be paid or transferred to Hicks. The TRO subsequently became a preliminary injunction, which remains in effect. In November 2000, a default judgment was entered against Hicks as a result of numerous and repeated discovery violations.

On March 21, 2001, the Witters filed an amended motion for the appointment of a custodian/receiver. During the hearing thereon, the Witters filed a motion to waive bond, asking the court to allow the receiver to act without requiring the Witters to post a bond.

Several hearings on the amended motion to appoint a custodian/ receiver were held. During one of these hearings, Hicks requested the trial court to enforce his election, pursuant to section 12.56(f) of the Act (805 ILCS 5/12.56(f) (West 1998)), to purchase the Witters' shares of stock. The trial court rejected Hicks' request. On July 24, 2001, the trial court filed a letter constituting its findings and rulings on the issue and directing the Witters to prepare a proposed order in accordance therewith. The trial court found "largely uncontradicted *** evidence" that Hicks had committed fraud, illegal and oppressive activities, a misapplication of corporate assets, self-dealing, and conflicts of interest. On July 25, 2001, the trial court entered the order prepared by the Witters' counsel, appointing Don Hoagland as the receiver and waiving bond.

Hicks immediately filed a motion requesting a clarification of the trial court's order. Hicks alleged that there were critical differences between the July 24, 2001, letter and the July 25, 2001, order. Specifically, Hicks alleged that the July 24, 2001, letter made no mention of the Witters' motion to waive bond or the fact that no hearing was held thereon. The order prepared by the Witters' counsel and entered by the trial court stated that a hearing was held on the motion to waive bond. Further, while the July 24, 2001, letter states that the "court waives any bond on the *part* of the interim receiver" (emphasis added), the July 25, 2001, order states that the "court waives any bond on the *parties* of interim receiver" (emphasis added).

On July 26, 2001, the trial court appointed Terry Sharp as the attorney for the receiver and held an *ex parte* hearing with the receiver

and his attorney. The receiver filed a motion asking the trial court to waive the attachment bond and for prejudgment attachments against Hicks. The trial court granted the motion waiving the attachment bond and entered five orders of prejudgment attachment.

On August 6, 2001, Hicks filed a motion to vacate the orders of attachment, arguing that the trial court did not have jurisdiction to enter those orders until an attachment bond was filed and that those orders were void in the absence of the filing of an attachment bond. The trial court denied Hicks' motion.

Hicks appealed the trial court's order appointing Hoagland as receiver. He also filed an interlocutory appeal of the trial court's order denying his motion to vacate the orders of attachment. This court ordered the appeals to be consolidated for purposes of the record, argument, and disposition.

In No. 5—01—0631, Hicks argues that the trial court erred in appointing an interim receiver because adequate legal remedies were available to the plaintiffs and because under section 12.56 the plaintiffs failed to meet their burden of proving that the appointment of a receiver was the most appropriate relief.

■ Section 12.56(a) of the Act provides that a shareholder may petition the circuit court for a variety of remedies if any of the following is established:

"(1) The directors are deadlocked, whether because of even division in the number of directors or because of greater than majority voting requirements in the articles of incorporation or the by[ ]laws or otherwise, in the management of the corporate affairs; the shareholders are unable to break the deadlock; and either irreparable injury to the corporation is thereby caused or threatened or the business of the corporation can no longer be conducted to the general advantage of the shareholders; or

(2) The shareholders are deadlocked in voting power and have failed, for a period that includes at least 2 consecutive annual meeting dates, to elect successors to directors whose terms have expired and either irreparable injury to the corporation is thereby caused or threatened or the business of the corporation can no longer be conducted to the general advantage of the shareholders; or

(3) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director, or officer; or

(4) The corporation assets are being misapplied or wasted." 805 ILCS 5/12.56(a) (West 1998).

■ Section 12.60(d) of the Act (805 ILCS 5/12.60(d) (West 1998)) provides that in an action brought pursuant to section 12.56, the

circuit court may appoint an interim receiver with such power and duties as the court, from time to time, may direct. An application for the appointment of a receiver is addressed to the sound discretion of the trial court, although the standards by which the court exercises its discretion are stringent. *Poulakidas v. Charalidis*, 68 Ill. App. 3d 610, 386 N.E.2d 405 (1979). The appointment of a receiver is an extraordinary and drastic remedy and is appropriate only in cases of urgent necessity when there is a present danger to the interests of the investors, consisting of a serious suspension of the business and an imminent danger of waste or dissipation of corporate assets. *Poulakidas*, 68 Ill. App. 3d at 614, 386 N.E.2d at 408.

In the present case, the circuit court found that MWT's directors were deadlocked and that irreparable injury to it is being caused or threatened by its inability to obtain financing and the commencement of litigation against it by its largest creditor. The court further found that Hicks had acted and was acting in a manner that was illegal, oppressive, and fraudulent and that corporation assets were being misapplied or wasted. With respect to illegal, oppressive, and fraudulent activity, the court found as follows:

"A. Fraud has been perpetuated by Hal D. Hicks inasmuch as he has received monies from fuel supplier rebate checks that were to be paid to the corporation but were siphoned into his own personal accounts for his own personal use. Further, rent checks for the Colorado Auto Auction have been paid to Hal D. Hicks and not the corporation.

B. Illegal activities have occurred inasmuch as no records were or are kept relating to interest charged to employees on employee loans, rendering records upon which tax information is compiled and resulting tax returns inaccurate. Further, payroll tax deposits have not and are not being made in a timely manner according to law.

C. Hal D. Hicks has caused oppressive activity to occur by the payment to him individually, and not the corporation, of rebate checks and Colorado Auto Auction rents. Further, Hicks, while a corporate officer and director of Midwest Transit, Inc., has submitted bids for mail routes for his own competing company (Mail-A-Way) while ceasing submission of such bids for Midwest and while using a Midwest employee to prepare and submit the bids. Other use has been made by Hicks of Midwest's corporate employees for Hicks' private use while on the corporate payroll. Additionally, Hicks treats the Buffalo Route as his own business and does not deposit the revenues received from said route into Midwest's accounts. Finally, Midwest has been paying Hicks' company, Sumner Mobile Homes, rent of $20,000.00 per month without corporate authority or authority from the Plaintiffs to do so."

With respect to the misapplication or wasting of corporate assets, the court found as follows:

"The above-mentioned checks retained by Hicks and not deposited into Midwest's corporate accounts, the use of corporate employees for non[ ]company business while on company time[,] and the payment of rent to Hicks' company without authority constitute misapplication of corporate assets."

In addition to the foregoing, the court found that Hicks was receiving large sums from MWT for trailers leased by him to the corporation and that Hicks failed to sustain the burden of proving fairness as required by section 8.60 of the Act (805 ILCS 5/8.60 (West 1998)). The court concluded that MWT's existence was in imminent jeopardy if the status quo were maintained and third-party intervention not ordered.

As noted above, the trial court's decision to appoint a receiver is reviewed using an abuse-of-discretion standard, albeit a strict one. We therefore turn to a review of the record to determine whether there is sufficient evidence to support the trial court's appointment of a receiver.

According to the evidence, Pilot Truck Centers, Inc., and Dixie Management Group supply fuel to MWT. Fabick Tractor sells engines to MWT, and Blue Beacon International provides truck washes. Each pays rebate monies to MWT as an incentive to buy its goods or services. These rebates are in the form of checks payable to MWT. Over a period of several years prior to April 20, 2000, Hicks cashed many of these rebate checks for his personal use or had employees cash the checks and give him the money. MWT employees Janie Ensminger and Becky Stoltz testified that Hicks gave them rebate checks with instructions to cash them and give him the money and that they did so. Hicks himself cashed over $170,000 in rebate checks and placed the money in his children's stock accounts. Hicks did not dispute this at the trial, nor does he dispute it in his brief on appeal. Hicks maintains that since the April 20, 2000, TRO, he has not retained any rebate monies and that rebate checks have been recorded in MWT's books from September 2000 through May 2001. We find Hicks' argument that his prior bad acts did not justify the appointment of a receiver to be without merit in light of the evidence in the present case. Hicks' conversion of rebate monies owed to MWT to his own use, taken with the other evidence, demonstrates a pattern of fraudulent and illegal activity and clearly supports the appointment of a receiver.

With respect to Colorado Auto Auction rent checks, the record also shows that MWT owns real estate in Commerce City, Colorado, which has been leased to Colorado Auto Auction at a rate of $3,000 per

month. Lease payments began in June 2000, but as of May 2001, only four such payments were recorded in MWT's books. Although the first month's lease check was made payable to MWT, the remainder were made payable to "Hal D. Hicks." Stoltz and Pam Mason, Hicks' personal secretary, each cashed at least one of these checks. Mason testified that she gave the money to Hicks. Hicks' wife cashed another of these checks in Florida. The remaining checks were endorsed by Hicks. Hicks offered no testimony about what happened to the money. Hicks contends that there is no evidence indicating where the proceeds of the remaining checks went and that the plaintiffs are simply inferring that he kept the money. The trial court found that these rent checks were paid to Hicks and that he retained them rather than depositing them into MWT's corporate accounts, and the evidence clearly supports this finding.

With respect to interest on employee loans, the record reveals that employees were allowed to borrow money from MWT and pay the money back, with interest, through a payroll deduction. Loan repayments are accumulated in each payroll, and the payroll generates a check for the total payable to MWT. Ensminger, the payroll clerk, cashes the check and transmits the money to Mason, allegedly so the money can be used for other loans. Mason conceded that no records were kept of the loans or the interest generated thereon. Thus, there was no way to keep track of the interest paid on the loans, which is income for MWT. Hicks contends that money from vendor rebates was held in a pool from which employees could receive loans and that, while interest was "sometimes" charged on these loans, the interest income generated from the loan program was reduced because "presumably" some loans were not paid back. Hicks disingenuously argues that the plaintiffs failed to introduce evidence of the actual income from the loan program. The plaintiffs' inability to introduce such evidence is a consequence of Hicks' failure to properly account for the interest income generated by the loan program. Even his argument on appeal that interest was "sometimes" charged and that "presumably" some loans were not repaid demonstrates that records were not adequately kept. Not only is this failure to properly account for income generated by the loan program not in accordance with generally accepted accounting principles, but it also creates potentially serious income tax problems.

In March 2000, Hicks formed an Illinois corporation named "Hal D. Hicks Mail Transportation, Inc.," which subsequently elected "Mail-A-Way" as an assumed name. The stated purpose of this corporation was to obtain government mail contracts, the same business as MWT. The articles of incorporation listed Stoltz as the

president and Ensminger as the vice president. Ensminger, who bids contracts for MWT, testified that she was instructed by Hicks not to bid contracts for MWT and to bid all contracts for Mail-A-Way. Ensminger acknowledged that the contracts being bid for Mail-A-Way were the same type of contracts MWT operates. She further conceded that some of these contracts were for work which had previously been done by MWT. Hicks maintains that MWT was not in a position financially to take advantage of this opportunity and could not have afforded the start-up costs of the new routes. The evidence demonstrates that any such financial weakness was the result of Hicks' mismanagement. In any event, this does not justify Hicks' use of MWT personnel to bid contracts for his own business, a business in direct competition with MWT, and his doing so clearly constitutes oppressive activity and a breach of his fiduciary duties to MWT.

The Buffalo route was a mail route operated by MWT. MWT pays for all fuel and other operating costs. MWT employees operate the route and handle all the paperwork for the route. MWT financial statements show a line item for revenue from the Buffalo route. Although maintained in Hicks' name, since its inception, revenue for the Buffalo route had been transferred to MWT. Since the beginning of the present suit, Hicks retained the revenue from the route, although it continues to be operated by MWT and at MWT's expense. Hicks acknowledges that several MWT trucks are used to operate the Buffalo route, but he argues that MWT uses 68 of his trucks but pays him nothing. Not only does this not justify Hicks' use of MWT assets and personnel to operate a route which is in his name and from which he keeps all revenue, but it also is exactly the type of commingling of personal and corporate assets that justifies the appointment of a receiver.

The trial court also found that MWT's payment of $20,000 per month in rent to Sumner Mobile Homes (SMH), a company owned by Hicks, constituted oppressive activity and self-dealing. According to the evidence, SMH owns the land and buildings used by MWT. Hicks concedes that MWT paid SMH $120,000 in 2001, which is clearly in violation of the April 20, 2000, TRO. Moreover, section 8.60 of the Act, dealing with director conflicts of interest, provides that if a director of a corporation, directly or indirectly, is a party to a transaction with that corporation, the person asserting the validity of the transaction bears the burden of proving that such transaction is fair to the corporation. 805 ILCS 5/8.60 (West 1998). Although Hicks argues that there was no showing that the amount SMH paid MWT was below market rate or that the transaction was otherwise improper, it was Hicks' burden to demonstrate that the transaction in question was fair to MWT, a burden that the record demonstrates he failed to meet.

■ In addition to the foregoing, the trial court found that Hicks' leasing of trailers owned by him to MWT constituted a conflict of interest as set forth in section 8.60. MWT leased the trailers from HDH Mail Transportation, a company owned by Hicks. Hicks maintains that MWT has been leasing trailers from him since 1993, that there is no evidence that the amount he charged was in excess of fair market value, and that he had corporate authority to do so. Again, it was Hicks' obligation to show that the transaction was fair to MWT. The trial court found that Hicks failed to meet this burden, and the record supports that finding.

In summary, the evidence overwhelmingly supports the trial court's finding that third-party intervention was necessary and supports its appointment of a receiver. Indeed, the evidence calling for that action is so clear that it would have been an abuse of discretion not to do so.

■ Hicks next argues that the trial court erred in ordering the use of his personal property without compensation or due process of law. He contends that the July 25, 2001, order precludes him from receiving his checks from the United States Postal Service for his operation of the Buffalo route, allows MWT to occupy lands owned by SMH without paying rent, allows MWT to use 68 tractors belonging to Hicks for the operation of its business, and allows MWT to use a number of trailers belonging to Hicks without paying for them.

The trial court's order of July 25, 2001, states as follows:

"C. All parties to this action shall be enjoined from interfering with the interim receiver's activities in any manner and shall be mandatorily enjoined to grant him and his agents and others under his command unfettered access to corporate premises, to all corporate property, and to all books, records[,] and accounts of the corporation. The parties are further enjoined from interfering in any way with the interim receiver's sole control of the finances of the corporation and are enjoined from diverting any funds away from the corporation and its accounts, including all fuel supplier rebate checks, all rent checks from Colorado Auto Auction, and all income generated by the Buffalo route.

D. The parties are further ordered to provide all of such funds and any other corporate funds which may make their way into the possession of the parties, or any one or more of them, during the interim receivership immediately to the interim receiver."

With respect to the rebate checks, the Colorado Auto Auction rent checks, and income generated from the Buffalo route, the evidence demonstrates that such revenue properly belongs to MWT. With respect to the various assets of his which Hicks claims MWT will be

allowed to use for free, there is nothing in the court's order that allows MWT to use these assets without fair compensation.

■ Hicks next argues that the trial court erred in waiving the plaintiffs' bond for the appointment of a receiver, because no hearing was held on the plaintiffs' motion to waive bond and because the trial court failed to set forth the factors upon which it relied. We agree that section 12.60(g) of the Act provides that a receiver "shall give such bond as the court may direct with such sureties as the court may require." 805 ILCS 5/12.60(g) (West 1998). In its July 25, 2001, order, the trial court waived any bond on the part of the interim receiver, but it did not set forth the facts it relied upon in waiving the bond. Section 2—415(a) of the Code of Civil Procedure (Code) provides that before a receiver is appointed pursuant to the Code, the party seeking the appointment of a receiver must give a bond unless the court, after notice and a hearing, determines that a bond is not required. 735 ILCS 5/2—415(a) (West 1998). There is no similar provision providing for the waiver of a bond in section 12.60(g) of the Act. We therefore remand the cause to the circuit court with directions that it require the receiver to give a bond pursuant to section 12.60(g).

■ Finally, Hicks argues that the trial court erred in denying his request to purchase the plaintiffs' shares of stock pursuant to section 12.56(f). Section 12.56(f) provides as follows:

"At any time within 90 days after the filing of the petition under this Section, or at such time determined by the court to be equitable, the corporation or one or more shareholders may elect to purchase all, but not less than all, of the shares owned by the petitioning shareholder for their fair value." 805 ILCS 5/12.56(f) (West 1998).

Plaintiffs' section 12.56 petition was filed on January 21, 2000. In his brief on appeal, Hicks acknowledges that he did not make his election within 90 days of the filing of the complaint, but he maintains that he did make this election within 90 days of the filing of the plaintiffs' amended motion for the appointment of a custodian/receiver. The 90-day period began to run when the plaintiffs filed their complaint. See *Hamlin v. Harbaugh Enterprises, Inc.*, 324 Ill. App. 3d 612, 755 N.E.2d 993 (2001). Thus, Hicks' election was not timely made. Although the trial court did not reject Hicks' election on that basis, it is well settled that this court may affirm a decision of the trial court on any basis appearing in the record.

■ In case No. 5—01—0660, Hicks argues that the trial court erred in entering the *ex parte* order of attachment because the receiver did not file an affidavit or post a bond as required by section 4—107 of the Code (735 ILCS 5/4—107 (West 1998)). Section 4—107 of the Code

provides that before the entry of an attachment order, the party seeking the order must file an affidavit and post a bond in an amount equal to twice the sum alleged to be due. Section 4—107 further provides that a bond shall not be required of the State of Illinois, any department of government thereof, or any state officer. In the present case, the receiver sought and obtained a waiver of the bond request on the grounds that as a receiver appointed by the court, he was a state officer within the contemplation of section 4—107.

A "receiver" is an officer of the court that appointed him. *Compton v. Paul K. Harding Realty Co.*, 6 Ill. App. 3d 488, 285 N.E.2d 574 (1972). The appointment of a receiver is an equitable remedy not dependent upon any statute and rests within the discretion of the trial court. *Compton*, 6 Ill. App. 3d at 497, 285 N.E.2d at 580. As an officer of the court, a receiver has no discretion or personal control over property in his hands, but he must obey orders of the court so long as they are unimpeached. *PSL Realty Co. v. Granite Investment Co.*, 76 Ill. App. 3d 978, 395 N.E.2d 641 (1979), *aff'd in part & rev'd in part on other grounds*, 86 Ill. 2d 291, 427 N.E.2d 563 (1981).

Hoagland argues that the judicial branch is a department of government and that, as an officer thereof, he is exempt from the bond requirement of section 4—107. We do not agree. Article V, section 9(a), of the Illinois Constitution provides that the Governor shall nominate and appoint all officers whose election or appointment is not otherwise provided for. Ill. Const. 1970, art. V, § 9(a). Generally, a state officer is one whose duties and powers are coextensive with the state and concern the state at large or the general public. *Ramsay v. Van Meter*, 300 Ill. 193, 133 N.E. 193 (1921). A public office is a public position created either by the constitution or by other law, and it must be a permanent position with continuous duties, with a successor that is either appointed or elected. *Ramsay*, 300 Ill. at 201, 133 N.E. at 195. We conclude that a receiver, though an officer of the court, is not a "state officer" as contemplated by section 4—107. A creature of equity, a receivership is not a permanent position but exists only until the property in the custody of the receiver has been disposed of. See *Federal Savings & Loan Insurance Corp. v. PSL Realty Co.*, 630 F.2d 515 (7th Cir. 1980). Because the attachment orders were entered without the required bond, they are void. 735 ILCS 5/4—107 (West 1998).

For the foregoing reasons, the judgment of the circuit court of Lawrence County in case No. 5—01—0631 appointing a receiver is affirmed, but the cause is remanded with directions that the court require the receiver to give a bond pursuant to section 12.60(g) of the

Act. In case No. 5—01—0660, the judgment is reversed, that is, the attachment orders are vacated.

No. 5—01—0631, Affirmed in part and reversed in part; cause remanded with directions.

No. 5—01—0660, Reversed.

KUEHN and CHAPMAN, JJ., concur.