JAMES "PATE" PHILIP, Indiv. and as Illinois Senate President, *et al.*, Plaintiffs-Appellees, v. RICHARD M. DALEY, Mayor of the City of Chicago, *et al.*, Defendants-Appellants (George H. Ryan, Governor of the State of Illinois, Defendant).

Second District   No. 2—02—0749

Opinion filed June 2, 2003.

Mara S. Georges, Corporation Counsel (Lawrence Rosenthal, Benna Ruth Solomon, and Jane Elinor Notz, Assistant Corporation Counsel, of counsel), and Emily Nicklin and Matthew T. Regan, both of Kirkland & Ellis, both of Chicago, and Christopher Landau and Kannon K. Shanmugam, both of Kirkland & Ellis, of Washington, D.C., for appellants.

Joseph V. Karaganis, A. Bruce White, and John W. Kalich, all of Karganis, White & Magel, Ltd., of Chicago, and Edward J. Walsh, Jr., and James H. Knippen, both of Walsh, Knippen, Knight & Diamond, Chtrd., of Wheaton,

and Robert G. Black, of Law Offices of Robert G. Black, of Naperville, for appellees.

Roger A. Keller, Jr., of Winston & Strawn, of Washington, D.C., for *amicus curiae* American Airlines, Inc.

JUSTICE GROMETER delivered the opinion of the court:

Plaintiffs, James "Pate" Philip, Henry Hyde, and the Village of Bensenville, initiated an action in the circuit court of Du Page County against defendants, the City of Chicago and Richard M. Daley. The complaint sought, *inter alia*, a declaration that an attempt by defendants to acquire property in anticipation of the expansion of O'Hare International Airport without first obtaining approval from the Illinois Department of Transportation (IDOT) was beyond the authority of the city. Plaintiffs also sought a preliminary injunction prohibiting defendants from proceeding with land acquisition, and the trial court granted this request. Defendants now appeal, and we affirm.

■ ■ Before proceeding further, we must address two matters. First, defendants have filed what they term an "Emergency Motion for Summary Reversal." We ordered the motion taken with the case. After the parties completed their briefing of this appeal, the supreme court delivered its decision in *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36 (2002) (*Birkett*), and it is upon this opinion that defendants base their motion. As we explain below, we find *Birkett* distinguishable. Thus, we deny defendants' motion. Second, we observe that, between them, the parties have combined to amass a total of 70 footnotes in their briefs. Supreme Court Rule 341(a) states, "Footnotes, if any, shall be used sparingly." Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(a) (eff. October 1, 2001). The parties are advised to abide by this rule in the future.

## I. BACKGROUND

On June 11, 2002, Chicago announced a plan seeking to acquire 433 acres adjacent to O'Hare for runway expansion. Chicago stated that it would acquire the property either through voluntary transactions with property owners or through the power of eminent domain. Within the area of Bensenville that Chicago wants to acquire lie 533 homes and 55 businesses. The area also contains a police station and a fire station. The housing in this area is affordable for people of low and moderate income. Further, the acquisition would displace over 400 students and possibly cause an elementary school to close.

■ Chicago did not seek IDOT's approval before commencing its land-acquisition program. The central issue involved in this appeal is

whether section 47 of the Illinois Aeronautics Act (Aeronautics Act) (620 ILCS 5/47 (West 2000)) requires a party seeking to acquire land for airport development to obtain a "certificate of approval" prior to proceeding. Section 47 states, in part, that "[i]t shall be unlawful for any municipality or other political subdivision *** to make any alteration or extension of an existing airport *** for which a certificate of approval has not been issued by [IDOT]." 620 ILCS 5/47 (West 2000). IDOT has promulgated a regulation explaining this language. The regulation provides:

"The phrase, 'alteration or extension', shall include any of the following:

a) Any material change in the length, width or direction of runways or landing strips;

b) Construction or installation of any building or other structure on the airport property which would extend above an approach slope or a transition slope or turning zone;

c) Planting or permitting to grow any growth or placement of any other obstacle on the airport property which would extend above an approach slope or a transition slope or turning zone." 92 Ill. Adm. Code § 14.640 (1998).

This regulation was enacted by IDOT in 1985.

Plaintiffs moved for a preliminary injunction, and a hearing was held on the matter. James Bildilli, the chief engineer of the Bureau of Airport Engineering for IDOT's Division of Aeronautics, testified, and an affidavit of his was submitted as well. Bildilli addressed IDOT's interpretation of section 47 of the Aeronautics Act. He explained that IDOT interprets "make any alteration or extension" (620 ILCS 5/47 (West 2000)) to mean "construct and put into service." He further stated that it has been IDOT's practice to wait until after the Federal Aviation Administration (FAA) has completed its approval process before taking action. This practice, according to Bildilli, allows IDOT to avoid unnecessary, costly duplication of functions properly performed by the FAA. See 620 ILCS 5/25 (West 2000). Further, Bildilli testified that IDOT does not require certification prior to land acquisition, even where the land is to be used for a runway. He added that if Chicago had sought a certificate prior to land acquisition, IDOT would have considered the application premature.

The trial court granted plaintiffs' request for a preliminary injunction. The trial court first observed that it is uncontested that Chicago intends at some point "to make" an alteration or extension of O'Hare; therefore, it must seek IDOT approval eventually. The court found that land acquisition is part of the process of "making" a runway. Thus, the court reasoned that, as part of the process of making a

runway, certification is required prior to land acquisition. The court also found that deference to IDOT's interpretation was inappropriate because the term "to make" (620 ILCS 5/47 (West 2000)), read in light of other pertinent portions of the Aeronautics Act, is not ambiguous. Accordingly, the trial court enjoined Chicago from proceeding with land acquisition until it obtained approval from IDOT.

## II. ANALYSIS

■ Defendants assert that the trial court should not have issued a preliminary injunction, arguing that the Aeronautics Act (620 ILCS 5/1 et seq. (West 2000)) does not require them to seek approval from IDOT prior to acquiring land and that, in the alternative, federal law preempts the permit process set forth in the Aeronautics Act (see 620 ILCS 5/47 (West 2000)). We disagree with both contentions. In reviewing the propriety of a preliminary injunction, we normally apply the abuse-of-discretion standard. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 177 (2002). However, the issues involved in this appeal turn largely on the construction of various statutes; therefore, we will conduct de novo review. *People v. Studio 20, Inc.*, 314 Ill. App. 3d 1000, 1004 (2000). Finally, as will become clear, our analysis differs somewhat from that of the trial court. It is well settled that we review the correctness of the result reached by the trial court, not its reasoning (*Department of Mental Health & Developmental Disabilities v. Illinois Civil Service Comm'n*, 103 Ill. App. 3d 954, 957 (1982)), and may affirm on any basis apparent in the record (*Witters v. Hicks*, 335 Ill. App. 3d 435, 445 (2002)).

## A. The Illinois Aeronautics Act

Defendants first contend that the Aeronautics Act does not require them to seek approval from IDOT before beginning its land-acquisition program. Defendants' reasoning is relatively straightforward. First, they note that both this court and the supreme court have held that section 47 of the Aeronautics Act is ambiguous regarding how significant an alteration or extension of an airport must be before certification is necessary. *Birkett*, 202 Ill. 2d at 47; *People ex rel. Birkett v. City of Chicago*, 329 Ill. App. 3d 477, 484 (2002). Second, they rely on the well-established principle that when a statute is ambiguous, courts generally defer to interpretations by an agency charged with administering the statute. *Automatic Data Processing, Inc. v. Department of Revenue,* 313 Ill. App. 3d 433, 444 (2000); *Smith v. Town of Normal*, 238 Ill. App. 3d 944, 949-50 (1992). Third, they note that IDOT interprets section 47 to require a certificate only for acts that impact on things such as runways and flight paths. See 92 Ill. Adm. Code § 14.640 (1998). Finally, they conclude that since land

acquisition does not affect such things, section 47 certification is not required, which is precisely what Bildilli stated was IDOT's position.

■ Defendants' reliance on IDOT's interpretation of section 47 is misplaced. When a statute is ambiguous, an interpretation by an agency charged with administering it is generally entitled to significant deference. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983). However, when a statute is not ambiguous, it must be applied without resort to further aids of construction (*Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999)), and there is no need to rely on an agency's interpretation of it (*Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 239 (1996)). Furthermore, an erroneous interpretation is not binding on a court. *Boaden*, 171 Ill. 2d at 239. An agency may not expand or contract the scope of a statute under the guise of interpretation. *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 203 (1989). In fact, our supreme court has stated that "[r]eviewing courts may not rubber-stamp administrative decisions they deem inconsistent with the statutory mandate or that frustrate the policy underlying the statute." *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 516 (1990), citing *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 78 L. Ed. 2d 195, 104 S. Ct. 439 (1983). Section 47 of the Aeronautics Act is not ambiguous regarding land acquisition for airport purposes. Accordingly, we have no occasion to defer to IDOT's interpretation of this statute, and, in any event, we would be bound to reject any interpretation that conflicts with its plain language.

■ In construing section 47, we begin with the fundamental maxims that the primary goal of statutory construction is to give effect to the intent of the legislature and that the best indicator of legislative intent is the plain language of the statute itself. *Mobil Oil Corp. v. Industrial Comm'n*, 327 Ill. App. 3d 778, 790 (2002). Section 47 states, in pertinent part:

"Operation without certificate of approval unlawful; applications. An application for a certificate of approval of an airport or restricted landing area, or the alteration or extension thereof, shall set forth, among other things, the location of all railways, mains, pipes, conduits, wires, cables, poles and other facilities and structures of public service corporations or municipal or quasi-municipal corporations, located within the area proposed to be acquired or restricted, and the names of persons owning the same, to the extent that such information can be reasonably ascertained by the applicant.

It shall be unlawful for any municipality or other political

subdivision, or officer or employee thereof, or for any person, to make any alteration or extension of an existing airport or restricted landing area, or to use or operate any airport or restricted landing area, for which a certificate of approval has not been issued by the Department; Provided, [*sic*] that no certificate of approval shall be required for an airport or restricted landing area which was in existence and approved by the Illinois Aeronautics Commission, whether or not being operated, on or before July 1, 1945." 620 ILCS 5/47 (West 2000).

The first paragraph quoted above sets forth certain requirements regarding what information must be included in an application for a certificate of approval. The second paragraph declares it unlawful to "make any alteration or extension" of an airport without such a certificate.

Our supreme court construed the phrase "make any alteration or extension" in *Birkett*, 202 Ill. 2d at 46-48. The supreme court first observed that a strict construction of the phrase would lead to an absurd result. *Birkett*, 202 Ill. 2d at 47. Specifically, it would require a certificate for any alteration of an airport, including such things as the installation of new drinking fountains or the replacement of worn carpeting. *Birkett*, 202 Ill. 2d at 47. The court also acknowledged that the phrase clearly would include the construction of a new runway. *Birkett*, 202 Ill. 2d at 47. *Birkett* involved improvements to a terminal and ground transportation facilities. The difficulty, according to the supreme court, arises when one attempts to determine whether a project lying at some intermediate point in the continuum between runway construction and the installation of a drinking fountain requires certification. *Birkett*, 202 Ill. 2d at 47.

The court then noted that the legislature provided no guidance for resolving this question in the language of section 47. *Birkett*, 202 Ill. 2d at 47. Accordingly, it looked to IDOT's interpretation of the statute for guidance. *Birkett*, 202 Ill. 2d at 47. IDOT construes "alteration or extension" to mean an improvement that "(1) materially alters the length, width, or direction of a runway or landing strips; or (2) extends above an approach slope, transition slope, or turning zone." *Birkett*, 202 Ill. 2d at 48; see 92 Ill. Adm. Code § 14.640 (1998). The court found this interpretation reasonable. *Birkett*, 202 Ill. 2d at 48-49. Since the statute was ambiguous and IDOT's interpretation was reasonable, the supreme court deferred to IDOT's interpretation. *Birkett*, 202 Ill. 2d at 53-54. The plaintiffs did not contend that the improvements at issue in *Birkett* would materially alter a runway or obstruct a turning zone, approach slope, or transition slope. *Birkett*, 202 Ill. 2d at 54. Hence, the defendants were entitled to proceed with these projects without seeking a certificate of approval from IDOT. *Birkett*, 202 Ill. 2d at 55.

■ The instant case does not involve construction; it involves land acquisition. In *Birkett,* the supreme court noted that the legislature expressed no concern for an airport's ground transportation or terminal facilities in the Aeronautics Act. *Birkett,* 202 Ill. 2d at 50. Conversely, the legislature has explicitly addressed the subject of land acquisition relative to the certification process in section 47 itself. The first paragraph of section 47 states:

> "An application for a certificate of approval of an airport *** shall set forth, among other things, the location of all railways, mains, pipes, conduits, wires, cables, poles and other facilities and structures of public service corporations or municipal or quasi-municipal corporations, located within *the area proposed to be acquired or restricted, and the names of persons owning the same,* to the extent that such information can be reasonably ascertained by the applicant." (Emphasis added.) 620 ILCS 5/47 (West 2000).

That the statute specifies that an application must include certain information about the "area proposed to be acquired" is a clear indication that the legislature intended the certification process to precede land acquisition. Additionally, the application must include the names of the owners of the property sought to be acquired; therefore, the statute indicates that, regarding land acquisition, the legislature contemplated someone other than the proprietor of the airport owning the land at the time the application for a certificate was filed.

In short, the legislature addressed the subject of land acquisition relative to the certification process, and the plain language with which it spoke on this subject shows that it intended land acquisition to follow certification. Because the legislature has spoken plainly on this issue, *Birkett* is distinguishable. There is simply no need to consult IDOT's interpretation of section 47. It is for this reason we also find defendants' reliance on an opinion letter written by IDOT's secretary beside the point. Moreover, to the extent that IDOT's interpretation conflicts with the plain language of the statute, it must be rejected. *Cella v. Sanitary District Employees' & Trustees' Annuity & Benefit Fund,* 266 Ill. App. 3d 558, 564 (1994) ("Even in light of [the] deference [normally accorded an agency], however, a court still has the authority to independently construe a statute and it will not adopt an agency's interpretation if it is inconsistent with the language of the statutory provision").

Defendants raise two main arguments as to why this conclusion should not follow. First, they point out that a statute must be interpreted as a whole and that a court must consider the purpose of the statute. *Petroline Co. v. Advanced Environmental Contractors, Inc.,* 305 Ill. App. 3d 234, 237 (1999). They argue that, considered as a

whole, interpreting the statute as requiring certification prior to land acquisition is inconsistent with the purposes of the Aeronautics Act. Second, they assert that the legislature has acquiesced in IDOT's interpretation of section 47.

It is true that the Aeronautics Act is primarily concerned with "maintaining a safe, uniform, and coherent system of flight patterns and air traffic." *Birkett*, 202 Ill. 2d at 50. However, it does not follow that air traffic and safety were the sole concerns of the legislature. Several other sections of the Aeronautics Act reveal that additional considerations are involved. First, we note that section 25 acknowledges a general concern for the "rights of others." 620 ILCS 5/25 (West 2000). More specifically, section 31 states that IDOT may create or modify a state airport plan with due regard for, *inter alia*, "the avoidance of unnecessary or unreasonable interference or conflict *** with existing important or essential facilities, or buildings devoted to the public use." 620 ILCS 5/31 (West 2000). Further, section 47 itself lists "railways, mains, pipes, conduits, wires, cables, poles and other facilities and structures of public service corporations or municipal or quasi-municipal corporations" as things that must appear in an application. 620 ILCS 5/47 (West 2000). While we agree that the legislature was concerned primarily with matters of air transportation when it enacted the Aeronautics Act, the above-cited sections reveal that the legislature was also concerned with the effect of airport development on surrounding communities. As such, we cannot agree that our interpretation of section 47 is inconsistent with the purposes of the Aeronautics Act.

Defendants also contend that the legislature has acquiesced in IDOT's interpretation of section 47. In *Birkett*, 202 Ill. 2d at 53, our supreme court held that the legislature had fully acquiesced in IDOT's construction of section 47. However, the issue confronting the court in *Birkett* was different from the one before us in this case, and the legislature's acquiescence in IDOT's interpretation relevant to the issue in *Birkett* has no bearing here. In other words, *Birkett* is distinguishable. In *Birkett*, the issue was whether certification is required for the construction of a terminal that does not affect runways or flight paths. In the instant case, the issue is land acquisition. On this subject, the legislature has spoken. That the legislature acquiesced in IDOT's interpretation of "alteration or extension" says nothing about land acquisition. As explained above, the plain language of section 47 indicates that certification must occur before land is acquired.

IDOT's interpretation limits the reach of section 47 regarding issues of airport construction and improvement to projects that affect

flight paths or runways. See 92 Ill. Adm. Code § 14.640 (1998). This interpretation does not conflict with the statute insofar as matters of construction and improvement are concerned. However, if this interpretation were to be applied to land acquisition, it would conflict with portions of section 47. A court "will not adopt an agency's interpretation if it is inconsistent with the language of the statutory provision." *Cella*, 266 Ill. App. 3d at 564; see also *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 91 (1992) (" 'Where the language of the act is certain and unambiguous the only legitimate function of the courts is to enforce the law as enacted by the legislature.' [Citation.]"). Thus, IDOT's interpretation cannot be applied to land acquisition.

In sum, we hold that the plain language of section 47 requires certification prior to land acquisition. Neither the purpose of the statute nor the General Assembly's acquiescence in IDOT's construction of the statute requires a different result. Accordingly, we find no error in the trial court's decision to grant plaintiffs' request for a preliminary injunction.

## B. Preemption

Defendants also contend that federal law preempts state regulation of the expansion of airport facilities. To resolve this issue, it is important to recognize precisely what it is that defendants are arguing. The challenge they make is to the certification process itself. At times, they point out specific substantive requirements of the Aeronautics Act that they find objectionable, such as section 48's directive that IDOT consider the effect of the proposed development on "the then current State airport plan" (620 ILCS 5/48 (West 2000)). However, these provisions are not ripe for review. IDOT has not sought to curtail the expansion of O'Hare based on such requirements. It has taken no action regarding Chicago's plan. We will not assume that, being aware of the dictates of federal law, IDOT will take any action that will conflict with federal law. See *Gromer Supermarket, Inc. v. Pollution Control Board*, 6 Ill. App. 3d 1036, 1044 (1972) ("No action by the Board has made the issue ripe for judicial determination. We do not know if the Board will act upon this subject matter or whether it will, after due hearing, adopt no regulation or even an amended regulation with which plaintiffs may be in full accord"). The sole issue before us is whether the existence of a state certification process, irrespective of the substantive requirements of certification, is preempted by federal law.

■ Before continuing, we must address plaintiffs' contention that this issue is not properly before this court. Plaintiffs argue that

defendants failed to raise this issue in the trial court in response to plaintiffs' motion for a preliminary injunction. However, as defendants point out, they did raise this issue, albeit briefly, in their memorandum opposing plaintiffs' motion. Accordingly, we will address this issue. We also note that this court recently addressed a similar issue and held that federal law does not preempt section 47. See *Birkett*, 329 Ill. App. 3d at 486-89. We adhere to that holding; however, in the instant case, an additional issue relevant to preemption has arisen.

■ Plaintiffs argue that the tenth amendment precludes preemption of the certification requirement set forth in section 47. U.S. Const., amend. X. The tenth amendment states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., amend. X. The Constitution recognizes that both the federal government and the states are sovereigns in their respective realms and that the federal government is one of limited, delegated powers. *Gregory v. Ashcroft*, 501 U.S. 452, 457, 115 L. Ed. 2d 410, 421, 111 S. Ct. 2395, 2399 (1991). To the extent that a power is delegated to Congress by the Constitution, Congress is free to legislate and, by virtue of the supremacy clause (U.S. Const., art. VI, cl. 2), displace state interests in a given area. *Gregory*, 501 U.S. at 460, 115 L. Ed. 2d at 423, 111 S. Ct. at 2400. In a sense, the tenth amendment "states but a truism that all is retained which has not been surrendered." *United States v. Darby*, 312 U.S. 100, 124, 85 L. Ed. 609, 622, 61 S. Ct. 451, 462 (1941). It "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157, 120 L. Ed. 2d 120, 138, 112 S. Ct. 2408, 2418 (1992).

The United States Supreme Court has confronted tenth-amendment issues in two main contexts. First, it has considered whether the tenth amendment precludes the application of a law of general applicability to a state. See, *e.g.*, *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 83 L. Ed. 2d 1016, 105 S. Ct. 1005 (1985). Second, it has addressed congressional attempts to commandeer "the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288, 69 L. Ed. 2d 1, 23-24, 101 S. Ct. 2352, 2366 (1981). The issue before us lies somewhere between these two lines of cases. At issue here is whether federal law preempts the requirement that a municipality of this state receive approval from an administrative agency of this state before commencing an improvement to an airport. We find both lines of cases relevant to our inquiry.

■ To resolve this issue, we must first consider both Chicago's status as a governmental body and the nature of the power it seeks to exercise. Regarding Chicago's status, we find the following passage instructive:

"It is universally recognized that municipal corporations are creatures of the State and that, absent constitutional restraints (*e.g.*, voting rights (*Gomillion v. Lightfoot* (1960), 364 U.S. 339, 5 L. Ed. 2d 110, 81 S. Ct. 125); 'home rule' (Ill. Const. 1970, art. VII, § 6)), they are subject to the will and discretion of the legislature. (See, *e.g.*, *Hunter v. City of Pittsburgh* (1907), 207 U.S. 161, 177-80, 52 L. Ed. 151, 158-60, 28 S. Ct. 40, 46-47; *City of Chicago v. M. & M. Hotel Co.* (1910), 248 Ill. 264, 268-69.) It is also well settled that the legislature has the power to fix and control the territory and boundaries of municipal corporations. (See, *e.g.*, *Richter v. City of Mt. Carroll* (1947), 398 Ill. 473, 477; *Geweke v. Village of Niles* (1938), 368 Ill. 463, 467, 117 A.L.R. 262; *Coles v. County of Madison* (1826), 1 Ill. 154, 160.) The legislature has provided various methods for altering municipal boundaries, including provisions for the disconnection of property. See generally Ill. Rev. Stat. 1985, ch. 24, par. 7—1—1 *et seq.*, par. 7—3—1 *et seq.*" *Harris Trust & Savings Bank v. Village of Barrington Hills*, 133 Ill. 2d 146, 153 (1989).

Thus, unless the state or federal constitution requires otherwise, Chicago's ability to acquire land for the purpose of expanding O'Hare is subject to the "will and discretion" of the General Assembly.

■ Chicago is a home rule municipality. *Endsley v. City of Chicago*, 319 Ill. App. 3d 1009, 1013 (2001). However, the ability to acquire land in another municipality for airport purposes is not a power it possesses by virtue of this status. See *Harris Bank of Roselle v. Village of Mettawa*, 243 Ill. App. 3d 103, 114-15 (1993) ("Any municipal attempt to exercise extraterritorial power is always subject to the requirements that the ordinance (1) be passed pursuant to legislative authority, (2) constitute a valid exercise of the police power, and (3) bear a reasonable relation to the public health, safety and welfare"); *Village of Sauget v. Cohn*, 241 Ill. App. 3d 640, 645 (1993) (holding that a home rule municipality does not have the authority to enforce its ordinances extraterritorially). Instead, this ability arises from a statutory grant of authority made by the General Assembly in the Illinois Municipal Code (see 65 ILCS 5/11—102—1, 11—102—4 (West 2000)). Because Chicago's ability to acquire land for O'Hare extraterritorially arises solely from a statutory grant, it is subject to the discretion of the legislature, and the legislature may attach any conditions it deems appropriate to its exercise. The legislature has specified that these provisions of the Illinois Municipal Code are subject to the provisions of the Aeronautics Act (see 65 ILCS 5/11—102—10 (West 2000)). As

explained in the preceding section, one of the requirements set forth in the Aeronautics Act is that a municipality obtain IDOT's approval before beginning a program of land acquisition. 620 ILCS 5/47 (West 2000). Thus, in the instant case, we are confronted with a municipality exercising a statutory power that it would not have in the absence of a legislative grant and upon which the legislature has placed certain conditions.

Defendants argue that federal law preempts the certification process itself. At its core, this contention amounts to a claim that the legislature must confer on Chicago the ability to acquire land, by condemnation or otherwise, in a neighboring municipality, so long as it relates to the construction or improvement of an airport. If such a principle were to be given effect, it would strike at the very heart of what it means to be a sovereign entity. See *Gregory*, 501 U.S. at 460, 115 L. Ed. 2d at 423, 111 S. Ct. at 2400 ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign"). The legislature implemented a scheme whereby various state entities are allocated certain powers. Not only would finding the certification process preempted alter this balance of power, it would amount to the federal government dictating how this state must structure its government and conduct its affairs. We do not believe Congress intended such a result in enacting any of the various federal statutes pertaining to aviation, and we further doubt that Congress has any authority to dictate to a state how it must structure its internal government— barring such things as a violation of the equal protection clause or a similar provision.

■ Preemption is, of course, a matter of congressional intent. *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 203-04, 75 L. Ed. 2d 752, 765, 103 S. Ct. 1713, 1722 (1983). Within the limits of its constitutional authority, Congress may preempt state authority. *Pacific Gas & Electric Co.*, 461 U.S. at 203, 75 L. Ed. 2d at 765, 103 S. Ct. at 1722. In fact, the Supreme Court has previously addressed the issue of preemption regarding local attempts to regulate air traffic and found that such attempts were preempted. See *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 36 L. Ed. 2d 547, 93 S. Ct. 1854 (1973). In *Burbank*, a municipality tried to impose a curfew on the operation of jet aircraft between the hours of 11 p.m. and 7 a.m. in order to limit the effect of aircraft noise on the surrounding community. In holding this action preempted, the Supreme Court relied on the "pervasive nature of the scheme of federal regulation of aircraft noise." *Burbank*, 411 U.S. at 633, 36 L. Ed. 2d at 554, 93 S. Ct. at 1859. The Court also noted that

preemption cases are *sui generis* and depend on "the peculiarities ***
of the federal regulatory scheme in question." *Burbank*, 411 U.S. at
638, 36 L. Ed. 2d at 556, 93 S. Ct. at 1862. Unlike in *Burbank*, we find
nothing in the federal regulatory scheme indicative of an intent by
Congress to interfere with the manner in which this state allocates
power among its various political organs.

▮ Where congressional action could alter the constitutional bal-
ance between federal and state power, it should not be lightly assumed
that Congress intended such a result. *Gregory*, 501 U.S. at 460-61, 115
L. Ed. 2d at 423-24, 111 S. Ct. at 2400-01. A court must be certain
that Congress intended to upset this balance. *Gregory*, 501 U.S. at
460-61, 115 L. Ed. 2d at 423-24, 111 S. Ct. at 2400-01. Thus, " '[i]f
Congress intends to alter the "usual constitutional balance between
the States and the Federal Government," it must make its intention
to do so "unmistakably clear in the language of the statute." [Cita-
tions.]' " *Gregory*, 501 U.S. at 460, 115 L. Ed. 2d at 424, 111 S. Ct. at
2401, quoting *Will v. Michigan Department of State Police*, 491 U.S.
58, 65, 105 L. Ed. 2d 45, 54, 109 S. Ct. 2304, 2309 (1989).

Mandating that a state alter the relationship of authority it has
established between its municipalities and agencies would certainly
"alter the constitutional balance between state and federal govern-
ment." See *Highland Farms Dairy, Inc. v. Agnew*, 300 U.S. 608, 612,
81 L. Ed. 835, 840, 57 S. Ct. 549, 551 (1937) ("How power shall be
distributed by a state among its governmental organs is commonly, if
not always, a question for the state itself"). In *Gregory*, the United
States Supreme Court considered whether the Age Discrimination in
Employment Act of 1967 (29 U.S.C. §§ 621 through 634 (1994))
provided a remedy to judges who were required to retire at the age of
70 by the Missouri Constitution. The court observed:

"The present case concerns a state constitutional provision
through which the people of Missouri establish a qualification for
those who sit as their judges. This provision goes beyond an area
traditionally regulated by the States; it is a decision of the most
fundamental sort for a sovereign entity. Through the structure of
its government, and the character of those who exercise govern-
ment authority, a State defines itself as a sovereign." *Gregory*, 501
U.S. at 460, 115 L. Ed. 2d at 423, 111 S. Ct. at 2400.

Furthermore, the court recognized that "[c]ongressional interference
with this decision of the people of Missouri, defining their constitu-
tional officers, would upset the usual constitutional balance of federal
and state powers." *Gregory*, 501 U.S. at 460, 115 L. Ed. 2d at 423, 111
S. Ct. at 2401. We see little difference between Congress interfering
with the selection of state officers and Congress interfering with the

way a state delegates authority among its various political subdivisions. Accordingly, we will not presume Congress intended such interference absent a plain statement to the contrary.

We are unaware of any such statement appearing in any of the statutes upon which defendants rely in support of their preemption argument. Defendants specifically rely on the Federal Aviation Act of 1958 (49 U.S.C. § 40101 *et seq.* (1994)), the Noise Control Act of 1972 (49 U.S.C. § 44715 (1994)), and the Airport and Airway Improvement Act of 1982 (49 U.S.C. § 47101 *et seq.* (1994)). The Seventh Circuit has expressly held that "[n]either the Constitution nor the Federal Aviation Act, as amended by the Noise Control Act of 1972, determines how Illinois apportions its governmental powers." *Bieneman v. City of Chicago*, 864 F.2d 463, 471-72 (7th Cir. 1988). Moreover, we have located no such statement in the Airport and Airway Improvement Act, which deals primarily with matters of funding (see 49 U.S.C. § 47101 *et seq.* (1994)), and defendants call our attention to no such passage. Therefore, we cannot conclude that Congress intended to preempt the way our government is structured in Illinois. The certification process that defendants challenge is a part of that structure.

We further doubt that Congress has the power to preempt the certification process set forth in section 47 (620 ILCS 5/47 (West 2000)). As noted above, Chicago's ability to acquire land outside its territorial borders is not a home rule power (*Harris Bank of Roselle*, 243 Ill. App. 3d at 114-15); rather, it is a power conferred upon Chicago as the result of a legislative grant (65 ILCS 5/11—102—1, 11—102—4 (West 2000)). The General Assembly has made an exercise of this power subject to the provisions of the Aeronautics Act (65 ILCS 5/11—102—10 (West 2000)), which includes section 47. Construing federal law as preempting the certification process is akin to saying that the General Assembly is required to grant Chicago more power. Because the power to acquire land extraterritorially for airport purposes arises from a legislative grant, it is the equivalent of saying that the General Assembly is required to legislate. We do not believe that this was Congress's intent, as we explain above. We include this discussion merely to point out a serious flaw in defendants' position.

Congress cannot, of course, compel a state to legislate. The Supreme Court has never "sanctioned explicitly a federal command *** to promulgate and enforce laws and regulations." *Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 761-62, 72 L. Ed. 2d 532, 548, 102 S. Ct. 2126, 2138-39 (1982). In *New York*, 505 U.S. 144, 120 L. Ed. 2d 120, 112 S. Ct. 2408, the Supreme Court confronted an attempt by Congress to compel states to regulate nuclear waste ac-

cording to Congress's instructions or to take title to the waste. The Court found that this attempt exceeded Congress's power and infringed on the core of state sovereignty, reasoning that the choice provided to the states was no choice at all, for "[n]o matter which path the State chooses, it must follow the direction of Congress." *New York*, 505 U.S. at 177, 120 L. Ed. 2d at 151, 112 S. Ct. at 2429. The Court went on to note that it knew of no other federal legislation that "offers a state government no option other than that of implementing the legislation enacted by Congress." *New York*, 505 U.S. at 177, 120 L. Ed. 2d at 151, 112 S. Ct. at 2429.

We recognize that the instant case differs significantly from *New York*. In *New York*, Congress had enacted a statute directing states to take certain actions. Here, the statutes upon which defendants rely contain no such provisions; rather, they are laws of general applicability. However, the underlying principles of *New York* provide some guidance. If we were to apply federal law in the manner advocated by defendants, we would be forced to say that the General Assembly is required to confer more power on Chicago than it has deemed proper. Federal law can no more compel the legislature to do so than it could compel New York to legislate according to federal standards or take title to nuclear waste. We see no significance in the fact that the compulsion would be indirect or unintentional in the present case. Congress cannot do accidentally what it could not do purposely.

Applying federal law in the manner urged by defendants would leave this state with no choice but to confer upon Chicago the authority to acquire land outside of its territorial limits. It is true that Congress can seek to influence state action. For example, it may make the receipt of federal funds contingent upon certain conditions. See *South Dakota v. Dole*, 483 U.S. 203, 207-08, 97 L. Ed. 2d 171, 178-79, 107 S. Ct. 2793, 2796 (1987). Similarly, where Congress otherwise has the power to regulate an area, it can condition a state's continued regulation of that area on compliance with federal standards at the pain of federal preemption if the state does not comply. *Hodel*, 452 U.S. at 288-90, 69 L. Ed. 2d at 23-24, 101 S. Ct. at 2366-67. However, accepting defendants' argument, no such choice is available here. If we were to find the certification process itself preempted, we would be finding that the legislature had to confer this authority upon Chicago unconditionally.

■ To conclude, we hold that federal law does not preempt the certification requirement contained in section 47 (620 ILCS 5/47 (West 2000)). Congress intended no such result, and even if it did, preemption of the internal governmental processes of a state is generally beyond its power. In another case involving O'Hare, the Seventh

Circuit provided this apt summarization: "Illinois might choose to exercise such powers as it has through the City Of Chicago, the 'owner' of O'Hare. It might withdraw home rule from Chicago and exercise these powers through legislation of general application. Or it might exercise these powers through the courts." *Bieneman*, 864 F.2d at 471. In short, the way we do business in this state is our business, and ours alone. We expressly do not pass upon whether any of the substantive provisions of the Aeronautics Act are preempted by federal law. The sole issue before us is whether the certification process itself is valid in light of federal regulation of air traffic. We conclude that it is. See also *City of Cleveland v. City of Brook Park*, 893 F. Supp. 742 (N.D. Ohio 1995).

## III. CONCLUSION

In light of the foregoing, we affirm the order of the circuit court of Du Page County granting plaintiffs' request for a preliminary injunction.

Affirmed.

HUTCHINSON, P.J., and GILLERAN JOHNSON, J., concur.