# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-4418

ST. JOHN'S UNITED CHURCH OF CHRIST,
HELEN RUNGE, and SHIRLEY STEELE,

*Plaintiffs-Appellants,*

*v.*

THE CITY OF CHICAGO, the FEDERAL
AVIATION ADMINISTRATION, and MARION C.
BLAKELY, Administrator of the
Federal Aviation Administration,

*Defendants-Appellees.*

---

Nos. 05-4450 & 05-4451

VILLAGE OF BENSENVILLE, VILLAGE OF
ELK GROVE, ROXANNE MITCHELL, REST
HAVEN CEMETERY ASSOCIATION,
ROBERT PLACEK, and LEROY H. HEINRICH,

*Plaintiffs-Appellants,*

*v.*

THE CITY OF CHICAGO, the FEDERAL
AVIATION ADMINISTRATION, and
MARION C. BLAKELY, Administrator of
the Federal Aviation Administration,

*Defendants-Appellees.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 3726—**David H. Coar**, *Judge.*

_____

ARGUED JANUARY 10, 2006; JUNE 7, 2006—
DECIDED SEPTEMBER 13, 2007

_____

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Mention Chicago to almost any person who has been on an airplane, and that person will immediately think of Chicago's O'Hare International Airport. It is one of the busiest airports in the world: in 2005, more than 76.5 million passengers passed through its facilities, along with 1.7 million tons of freight. See http://www.flychicago.com/events/KidsPage2006/OHareHistory.shtm (last visited August 27, 2007). It is also of central importance to the economy of Chicago and Northern Illinois, generating approximately 514,000 jobs for the region and nearly $37 billion a year in economic development. *Id.* Responding to growth in demand for O'Hare's services, the Illinois General Assembly passed the O'Hare Modernization Act (OMA), 620 ILCS 65/5, in 2003, in order to improve and expand the airport. This case deals with certain land acquisitions contemplated by that legislation.

We consolidated these appeals for decision because each raises challenges to the same district court order in lawsuits filed by objectors to the modernization project. In that order, the court denied a motion for leave to file a second amended complaint (for all but one count) and refused to enjoin the City of Chicago's plan to acquire each plaintiff's property in order to build additional

runways at O'Hare. In appeal number 05-4418, the St. John's United Church of Christ and two of its parishioners (collectively, St. John's) challenge the district court's denial of their motions for leave to file a second amended complaint and for a preliminary injunction. St. John's claims that the City's attempt to condemn a cemetery located on church property violates the First Amendment's Free Exercise Clause, the Fourteenth Amendment's Equal Protection Clause, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq*. We consider only the claims St. John's has asserted against the City; its claims against the Federal Aviation Administration (FAA) were resolved in the FAA's favor by the court of appeals for the District of Columbia Circuit in *Village of Bensenville v. FAA*, 457 F.3d 52 (D.C. Cir. 2006).[1]

---

[1] The main issue before the D.C. Circuit concerned whether the FAA had violated the federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.*, by approving the City's plan and determining that the plan was eligible for federal funding. As an "agency . . . of the United States," § 2000bb-2(1), the FAA, unlike the City, falls within the scope of RFRA and thus must meet the requirements of strict scrutiny when its actions substantially burden exercise of someone's religion. The D.C. Circuit considered whether any potential burden on the exercise of religion in this case could be fairly attributable to the FAA by virtue of its having approved the City's plan. Because "[t]he expansion plan for the airport, which is owned by the City, was prepared and will be implemented by the City, which is prepared to proceed without federal funds if necessary," the court found that it was the City, not the FAA, that was responsible for any potential burden on religion that resulted from the plan. *Bensenville*, 457 F.3d at 57. It thus rejected the RFRA claims against the FAA without reaching the question whether the FAA had shown a compelling governmental interest supporting its decision.

In appeal number 05-4450, the Villages of Bensenville and Elk Grove (Municipal Plaintiffs) contend that the district court erred in concluding that it lacked jurisdiction to review their claims against the FAA. Lastly, in appeal number 05-4451, we consider the challenge of the Rest Haven Cemetery Association and two members of its board of directors (collectively, Rest Haven) to the district court's dismissal of the first amended complaint. Rest Haven was not named in the proposed second amended complaint because the City no longer plans to acquire its cemetery. The district court concluded, for that reason, that its claim was moot; Rest Haven disagrees with that assessment. In Rest Haven's appeal, we also consider the same question raised by the Municipal Plaintiffs, namely, whether the district court had jurisdiction to consider Rest Haven's claims against the FAA. We conclude that the district court navigated its way through these complex issues successfully, and we thus affirm its judgment in all respects.

# I

In the summer of 2001, the U.S. Senate Commerce, Energy, and Transportation Committee held hearings in Chicago to discuss the ways in which delays at O'Hare contribute to excessive aviation delays throughout the United States. During the course of these hearings, the Committee strongly hinted that if the City of Chicago and the State of Illinois did not reach a decision on airport expansion before September 1, 2001, Congress would likely intervene.

On June 29, 2001, the City announced its plan to increase O'Hare's capacity; this plan later developed into the O'Hare Modernization Program (OMP). The OMP proposed to correct some of the inefficiencies created by the airfield's outdated configuration of seven intersecting

runways (which include a "runway triangle" created by the three original intersecting runways that lie north of the present terminals) by creating six parallel and two crosswind runways. The proposed design resembles the more effective runway architecture that has been employed at Hartsfield-Jackson Atlanta International Airport and the Dallas/Fort Worth International Airport. In contrast to the current layout of intersecting runways, in which the ability to use one runway is limited by whether an aircraft is using any of the others, the proposed configuration would permit a constant stream of take-offs and landings on each parallel runway, regardless of the activity that may simultaneously be occurring on adjacent runways.

On December 5, 2001, the Mayor of Chicago and the Governor of Illinois announced that they had reached an agreement on the central components of the proposed OMP. Shortly thereafter, the FAA submitted its Notice of Intent to Prepare an Environmental Impact Statement (EIS), which is a "detailed analysis . . . conducted to determine if, or the extent to which, a particular agency action will impact the environment." *Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 949 (7th Cir. 2000). All federal agencies are required to prepare an EIS for any "major Federal actions significantly affecting the quality of the human environment." See the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C).

In June of 2002, the City announced its plan to acquire 433 acres of land located in the Villages of Elk Grove and Bensenville, two municipalities adjacent to O'Hare, in anticipation of the airport's expansion. A wide variety of properties were scheduled for condemnation, including a number of homes and businesses, a police and fire station, an elementary school, several parklands, and the two cemeteries at issue here—St. Johannes and Rest

Haven, owned by the St. John's United Church of Christ and the Rest Haven Cemetery Association, respectively. The Municipal Plaintiffs responded by filing suit in state court seeking both a declaration that any effort to acquire the desired property without first obtaining a "certificate of approval" from the Illinois Department of Transportation was beyond the City's authority under the Illinois Aeronautics Act, see 620 ILCS 5/47, and a preliminary injunction preventing the City from proceeding with its land acquisition plan. On July 9, 2002, the Circuit Court of DuPage County granted the municipalities' requested relief; the Illinois Appellate Court affirmed its decision. See *Philip v. Daley*, 790 N.E.2d 961 (Ill. App. Ct. 2003).

Faced with this setback, the City turned to Springfield and the Illinois General Assembly for help. It was successful in persuading the legislature to enact the OMA in May of 2003. See 620 ILCS 65/5. The Act's statement of findings and purposes notes the importance of O'Hare to both the state and national air transportation system and affirms the necessity of acquiring adjacent properties as part of the modernization program. See OMA § 5(a)(1), (2), (5). In addition, the Act proclaims that "[i]t is the intent of the General Assembly that all agencies of this State and its subdivisions shall facilitate the efficient and expeditious completion of the O'Hare Modernization Program to the extent not specifically prohibited by law, and that legal impediments to the completion of the project be eliminated." OMA § 5(b).

The Act specifically addresses the issue of acquisition of property in several places. It does so generally in section 15, which grants to the City "[i]n addition to any other powers the City may have, and notwithstanding any other law to the contrary," the power to

> acquire by gift, grant, lease, purchase, condemnation . . . or otherwise any right, title, or interest in any private property, property held in the name of or

belonging to any public body or unit of government, or any property devoted to a public use, or any other rights or easements, including any property, rights, or easements owned by the State, units of local government, or school districts, including forest preserve districts, for purposes related to the O'Hare Modernization Program.

OMA § 15. Lest there be any doubt on the particular topic of cemeteries, the Act continues: "The powers given to the City under this Section include the power to acquire, by condemnation or otherwise, any property used for cemetery purposes within or outside of the City, and to require that the cemetery be removed to a different location." See also *id.* § 92 (amending the Illinois Municipal Code, 65 ILCS 5/11-51-1, to make it clear that the City of Chicago need not obtain the consent of a cemetery's owner in order to exercise its powers under § 15 of the OMA, even though such consent is normally required).

The OMA amends many statutes—indeed, as counsel for the City argued, it seems to have amended every statute that someone thought might stand in the way of the OMP. Thus, for example, it amends the Downstate Forest Preserve District Act, 70 ILCS 805/5e, OMA § 93; the Vital Records Act, 410 ILCS 535/21, OMA § 93.5; the Illinois Aeronautics Act, 620 ILCS 5/38.01, OMA § 94; and the Code of Civil Procedure, 735 ILCS 5/2-103, OMA § 95. Among these many modifications is the one that is central to this litigation: the addition of a new section 30 to the Illinois Religious Freedom Restoration Act (IRFRA), 775 ILCS 35/1 *et seq.* OMA § 96. The IRFRA provides generally that the "[g]overnment may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest." 775 ILCS 35/15. That broad

language was qualified by the new section 30, which states: "Nothing in this Act [*i.e.* IRFRA] limits the authority of the City of Chicago to exercise its powers under the [OMA] for the purpose of relocation of cemeteries or the graves located therein." 775 ILCS 35/30.

On May 30, 2003, shortly after the legislature enacted the OMA, the Municipal Plaintiffs, St. John's, and Rest Haven filed suit in the United States District Court for the Northern District of Illinois against the City of Chicago, Mayor Richard M. Daley, the State of Illinois, Governor Rod Blagojevich, and both the FAA and its administrator alleging a number of violations of federal law. On June 19, 2003, Plaintiffs filed an amended complaint. Most of the counts of the amended complaint challenged the City's plan to acquire land before the FAA issued its EIS or Record of Decision (ROD). Additionally, all of the Plaintiffs alleged that the City, along with the Mayor, violated NEPA and its implementing regulations, the National Historic Preservation Act (NHPA), 16 U.S.C. § 470, *et seq.*, § 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), as well as provisions of the Administrative Procedures Act, 5 U.S.C. § 706.

In the amended complaint, St. John's and Rest Haven also asserted a number of claims based on religion against the City. They alleged that the City, in proposing to condemn their cemeteries without demonstrating a compelling governmental interest and use of the least restrictive mechanism, as IRFRA ordinarily requires, violated their constitutional rights under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. These plaintiffs charged that the City is "targeting" their religious activities and posing a substantial burden on their ability to practice their religion. Plaintiffs also alleged that the City's plan to condemn their cemeteries violated the federal Religious Land Use and Institutionalized Persons

Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* Additionally, they asserted violations of the Fifth Amendment's Takings Clause and the Fourteenth Amendment's Due Process clause. Finally, these Plaintiffs raised similar religion-based claims against the State of Illinois and Governor Blagojevich, and against the FAA and its administrator, including an allegation that the FAA violated the federal RFRA. On March 29, 2005, the district court dismissed the State of Illinois and Governor Blagojevich from the case on Eleventh Amendment immunity grounds.

As this suit was pending before the district court, the parties entered into a court-approved order under which the City agreed that it would not acquire property in Bensenville and Elk Grove, including the St. John's and Rest Haven Cemeteries, until the FAA issued an EIS or a ROD. At the end of 2003, the City began to move forward with other components of its plan to expand O'Hare, seeking FAA approval for over $1.3 billion in federal funds for "Phase One" of the OMP. Specifically, the City requested about $300 million in airport improvement program discretionary funds, $63 million in entitlement funds, and over $1 billion in Passenger Facility Charge (PFC) funds. Phase One of the project was to include the demolition of the cemeteries, as well as other property in the villages. In late July of 2005, the FAA issued its final EIS, which compared the environmental impact of the City's proposal with other alternatives and concluded that the City's airport plan, with some minor revisions, was the preferred course. The EIS also reviewed the legal issues raised by St. John's and Rest Haven, ultimately concluding that if the City's plan was approved in the ROD, the St. Johannes Cemetery would be relocated, while the Rest Haven Cemetery would not.

On September 30, 2005, the FAA issued its ROD granting the City's request for approval of its airport layout plan. The ROD considered St. John's RFRA claims and

concluded that although the acquisition and relocation of the St. Johannes cemetery was likely to burden the exercise of the parishioners' religion substantially, the City had a compelling interest in relocating the cemetery in order to make O'Hare more efficient. The same day that the FAA issued its ROD, the Municipal Plaintiffs and St. John's filed a petition for review of the EIS and ROD in the D.C. Circuit. Their petition alleged, among other things, that the FAA's approval of the airport layout plan violated a number of provisions of federal law, including the First and Fifth Amendments and RFRA. Along with their petition for review, the Plaintiffs filed an emergency motion for a stay pending appeal and a motion for an administrative stay, which the D.C. Circuit granted. Rest Haven was not a party to this litigation.

In light of the FAA's approval of the airport layout plan and the claims pending before the D.C. Circuit, the district court issued an order to show cause why certain parties and claims should not be dismissed. Given that the Rest Haven Cemetery had by then been excluded from the OMP and that the City was not challenging this step, the district court suggested that Rest Haven should voluntarily dismiss itself from the suit. The district court also ordered the Plaintiffs to show cause why Mayor Daley should not be dismissed from the suit, because suing him in his official capacity and suing the City of Chicago amounted to the same thing. The district court also questioned its jurisdiction to review claims asserted against the FAA involving the ROD.

Before the district court issued its show cause order, however, the FAA informed the D.C. Circuit that it planned to award the City the $363 million in discretionary funds it had requested to begin the implementation of the first phase of the OMP. It made this announcement despite the fact that it had not yet formally rendered a decision granting the City's request. The City argued

that in the absence of the FAA's final order rendering a decision on funding, the court was without jurisdiction to consider Plaintiffs' NEPA and RFRA claims. On October 25, 2005, the D.C. Circuit denied St. John's and the Municipal Plaintiffs' emergency motion for a stay pending appeal, determining that they had not demonstrated either the irreparable injury or the likelihood of success on the merits required for the issuance of a stay pending review. At that point, the court did not address the jurisdictional question.

On October 26, 2005, St. John's and the Municipal Plaintiffs returned to the district court and filed a motion for leave to file a second amended complaint. Rest Haven was not listed as a party to the motion for leave to file the second amended complaint. The proposed second amended complaint included a claim that the FAA had violated the Freedom of Information Act (FOIA), 5 U.S.C. § 552, *et seq.*, when it allegedly ignored the Plaintiffs' requests for documents relating to O'Hare's expansion. On October 31, 2005, St. John's filed a motion for a temporary restraining order and a motion for a preliminary injunction, seeking to halt all action on the City's part while all these challenges were pending. The district court entered a temporary restraining order as it reviewed these motions.

After filing these motions in district court, the Plaintiffs then filed a docketing statement of issues in the D.C. Circuit. In addition to the claims they raised against the FAA before the district court, Plaintiffs asked the D.C. Circuit to decide whether it was improper for the FAA to fail to rule on Chicago's funding applications, whether the FAA had issued an unlawful ROD, and whether their First Amendment and RFRA claims were entitled to *de novo* review of disputed factual questions in an Article III court.

At that juncture, the district court dismissed Rest Haven from the litigation. Because the City no longer planned to acquire the Rest Haven Cemetery, and because Rest Haven did not present any argument explaining why or how it might be affected by either the City's or the FAA's actions in their response to the order to show cause, the district court held that its claims were moot. The court also dismissed Mayor Daley from the litigation, concluding that the Plaintiffs had not responded to the issue it raised in the order to show cause (whether it was redundant to sue both the City and the Mayor in his official capacity). The Plaintiffs do not challenge the dismissal of Mayor Daley from this suit on appeal.

With respect to St. John's religious claims against the City, the district court concluded that the Plaintiffs failed to state a claim upon which relief could be granted under the Free Exercise Clause or the Equal Protection Clause. It found that the OMA was constitutional on its face and that there was no indication that any of the City's proposed actions were motivated by St. John's religious affiliation. The district court also denied St. John's motion for leave to file a second amended complaint with respect to these claims, finding them to be similarly lacking. Additionally, the district court dismissed all counts of the complaint that pertained to RLUIPA, concluding that the City's plan to condemn the St. Johannes Cemetery was not a "land use" regulation as contemplated by that statute.

The district court also dismissed the bulk of St. John's and the Municipal Plaintiffs' claims against the FAA and its administrator. It concluded that it lacked jurisdiction to review challenges to the FAA's actions concerning the ROD because under 49 U.S.C. § 46110, those claims fell within the exclusive jurisdiction of the court of appeals. Indeed, as the court recognized, the D.C. Circuit was already considering these claims. After dismissing

these claims, all that remained was St. John's and the Municipal Plaintiffs' FOIA claim, for which the district court granted the motion for leave to file a second amended complaint. Given the dismissal of virtually all of the Plaintiffs' claims against the City and the FAA, the district court vacated the temporary restraining order and denied the motion for a preliminary injunction as moot. Plaintiffs have appealed from that decision. See 28 U.S.C. § 1292(a)(1).

## II

We review *de novo* the district court's grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, accepting as true "all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). We may affirm the dismissal only if the complaint fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 127 S. Ct. at 1974. As we held in *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 2007 WL 2406859 (7th Cir. Aug. 24, 2007), a district court should dismiss a complaint if "the factual detail . . . [is] so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Id.* at *5. A district court's decision whether to allow a party to file a second amended complaint, however, is reviewed for abuse of discretion. See *Doherty v. Davy Songer, Inc.*, 195 F.3d 919, 927 (7th Cir. 1999).

With respect to the district court's decision that St. John's motion for a preliminary injunction is moot, we review the court's "findings of fact for clear error, its balancing of the factors for a preliminary injunction under the abuse of discretion standard, and its legal

conclusions *de novo.*" *Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001). In assessing whether a preliminary injunction is warranted, we must consider whether the party seeking the injunction has demonstrated that "1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest." *Id.*

### III

Before turning to the merits, we must address two jurisdictional issues that the Municipal Plaintiffs and Rest Haven have raised. The first is whether the district court erred in dismissing with prejudice all claims brought by Rest Haven as moot, because the City no longer plans to acquire that cemetery. Second is the question whether the district court correctly dismissed the Municipal Plaintiffs' claims against the FAA for lack of jurisdiction based upon 49 U.S.C. § 46110. We review *de novo* the district court's grant of a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), which includes a dismissal on mootness grounds. See, *e.g.*, *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002). "When reviewing a dismissal for lack of subject matter jurisdiction, we note that a district court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). In considering such a motion, "[t]he district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has

been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.*

### A.  Rest Haven

At the beginning of the EIS process, the City submitted to the FAA a proposed revision to its airport layout plan that included the construction of a runway in an area that would require the relocation of existing air cargo facilities. In that proposed plan, the City indicated that it wanted to move these facilities to the site that is currently the Rest Haven Cemetery. The FAA concluded in its final EIS, however, that it would be possible to relocate the air cargo facilities without disturbing Rest Haven. Ultimately, on September 29, 2005, the FAA issued its ROD approving a revised airport layout plan "that depict[ed] cargo building repositioning, but also show[ed] that Rest Haven Cemetery w[ould] remain in private ownership." The ROD also reaffirmed that there would be no basis for the mandatory reinterment of bodies at Rest Haven, and it assured that the cemetery would "remain available for future burials, and for visitation and care of the graves by members of the public." This convinced the district court that there was no longer a live controversy among Rest Haven, the City, and the FAA; it therefore dismissed all counts brought by Rest Haven in the first amended complaint with prejudice.

Like the district court, we see no reason why Rest Haven should not be dismissed from this litigation. Under Article III, § 2 of the United States Constitution, federal court jurisdiction is limited to "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). "[W]hen the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," the case is (or the claims are) moot and must be dismissed for lack of jurisdiction. *Powell v. McCormack*, 395 U.S. 486, 496 (1969);

see also *Stotts v. Cmty. Unit. Sch. Dist. No. 1*, 230 F.3d 989, 990-91 (7th Cir. 2000). The fact that Rest Haven at one point was entitled to pursue this action makes no difference. In order to satisfy Article III's jurisdictional requirements, "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). As of July 2005, "the dispute between the[se] parties no longer rages"; in fact, the FAA granted Rest Haven precisely the relief it wanted—the agency approved a layout plan that leaves it alone. *Holstein v. City of Chicago*, 29 F.3d 1145, 1147 (7th Cir. 1994). In fact, the ROD goes one step further: it requires the City to provide a road to the cemetery to allow continued access to its grounds and to ensure that its daily activities are not unduly disturbed by the surrounding construction. Once a plaintiff's entire demand is satisfied, "there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under FED. R. CIV. P. 12(b)(1), because he has no remaining stake." *Rand v. Monsanto Co.*, 926 F.2d 596, 598 (7th Cir. 1991); see also *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (noting that a case becomes moot when a court's decision can no longer affect the rights of litigants in the case before it and would be nothing but an advisory opinion on hypothetical facts).

In response to the district court's order to show cause why its claims should not be dismissed, Rest Haven complained that it was uncomfortable without an enforceable court order providing that "Chicago will preserve and leave forever undisturbed the graves of the departed at Rest Haven," as well as an order requiring Chicago to "guarantee the Rest Haven plaintiffs continued access to the Rest Haven Cemetery." In its reply brief here,

Rest Haven concedes that the City's representation that it will not acquire Rest Haven Cemetery "may moot the claim for injunctive relief." See *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006) ("In an action seeking only injunctive relief . . . once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot."). At oral argument, however, Rest Haven appeared to defend the necessity of the order it requested on the ground that, without such an order, the City might unilaterally terminate its agreement not to condemn Rest Haven. This fear is motivating some of Rest Haven's religious adherents to bury their loved ones elsewhere out of fear of future disinterment.

If the City could change its mind at any time, Rest Haven might have a point. But that is not the case here. There is no indication on this record that the City has the authority to modify the airport layout plan without FAA approval. As the City represented at oral argument, it took approximately four years for the FAA to approve the plan at issue, and the City has no immediate intention to seek modification of the approved airport layout plan in favor of one that requires it to condemn the Rest Haven Cemetery. To the contrary, the City stated that it is quite eager to implement the approved plan. Rest Haven's fear that the City may one day change its mind and seek to acquire its cemetery is rooted in nothing but speculation. In order to satisfy Article III's justiciability requirements, "[t]he injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). If and when the day comes when the City or some other governmental entity wants to condemn the Rest Haven Cemetery, Rest Haven will have ample opportunity to defend itself before all appropriate tribunals.

If what Rest Haven wants is a perpetual injunction against the City requiring it to leave its cemetery undis-

turbed until the end of time, it is overreaching. The power of eminent domain is a fundamental power of government, and a court cannot restrict future governmental authorities from its proper use. Moreover, any injunction issued by a court of equity is itself subject to later modification. See *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992); *New York State Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956, 967 (2d. Cir. 1983) ("The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible."). Courts grant injunctive relief with the understanding that there will be an "opportunity for modifying or vacating [the] injunction when its continuance is no longer warranted." *Milk Wagon Drivers Union v. Meadowmoor Dairies*, 312 U.S. 287, 298 (1941). Neither the district court nor this court is empowered to enjoin the City from *ever* seeking to acquire Rest Haven's property, no matter what the reason. Rest Haven also indicated at oral argument that it would be satisfied with a court order finding as a fact that there would be a substantial burden to its First Amendment rights in the event of a future taking. This will not do. In the absence of a live controversy, such an order would be no more than an advisory opinion, which, as we are sure Rest Haven knows, federal courts are without constitutional authority to issue.

Rest Haven also argues that its claims are not moot because it wants a declaratory judgment establishing that OMA's amendment to IRFRA violates the First Amendment and the RLUIPA. This, at least, looks more like an ongoing controversy. Because Rest Haven did not advance this argument either before the district court or in its opening brief, however, we consider it waived. See *Nelson v. LaCrosse County Dist. Attorney*, 301 F.3d 820, 836 (7th Cir. 2002) (arguments raised for the first time in the reply brief are waived). Waiver or forfeiture aside, the argument has no merit. Even though *someone* may be

affected by the IRFRA amendment, that "someone" is no longer Rest Haven, and it is well established that the "case or controversy" requirement applies to declaratory judgments, just as it applies to every other kind of litigation in federal court. See *Powell*, 395 U.S. at 518 ("The availability of declaratory relief depends on whether there is a live dispute between the parties. . . ."); see also *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 528 (7th Cir. 2001) (noting that a claim for declaratory judgment was moot where "relief . . . would have no impact on the parties to th[e] suit").

### B. Municipal Plaintiffs and Rest Haven: FAA Claims

The district court also found that it lacked jurisdiction to review the Municipal Plaintiffs' and Rest Haven's claims against the FAA because these claims fell within the exclusive jurisdiction of the court of appeals under 49 U.S.C. § 46110. After dismissing Rest Haven from the litigation, the district court decided that it lacked jurisdiction to review the claims against the FAA that related to the issuance of the ROD. Because Rest Haven was not a party to this complaint, it has no "personal stake" in the appeal of the district court's denial of St. John's and the Municipal Plaintiffs' motion for leave to file a second amended complaint on this ground. See, *e.g.*, *Freedom from Religion Foundation, Inc. v. Bugher*, 249 F.3d 606, 609 (7th Cir. 2001) ("Under Article III, only a plaintiff with a personal stake in a case or controversy has standing."). Even if Rest Haven were a party to the second amended complaint and its claims were not moot, the district court would still lack jurisdiction to review either Rest Haven's or the Municipal Plaintiffs' claims against the FAA. The jurisdictional language in 49 U.S.C. § 46110 could not be plainer. It says that

> a person disclosing a substantial interest in an order issued by . . . the Administrator of the Federal Avia-

tion Administration with respect to aviation duties and powers designated to be carried out by the Administrator . . . in whole or in part under this part [or] part B . . . may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business.

49 U.S.C. § 46110(a). "Part B" refers to the Airport Development and Noise provisions of the same subtitle, see 49 U.S.C. § 47107, *et seq.*, which include the provision that grants the FAA the authority to review airport layout plans. See 49 U.S.C. § 47107(a)(16). The statute goes on to provide that the court of appeals has "exclusive jurisdiction to affirm, amend, modify or set aside any part of the order." 49 U.S.C. § 46110(a).

The Plaintiffs' arguments urging that the district court had the authority to consider these claims are without merit. First, Rest Haven argues that the federal RFRA, which Rest Haven claims the FAA has violated, commands that contested issues of fact pertaining to violations of that statute be tried in the federal district court. In support of this claim, they cite § 2000bb-1(c) of the Act, which provides that a person alleging a violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding" and that standing to assert such a claim is "governed by . . . article III of the Constitution." Plaintiffs urge that this language means that they are entitled to an Article III proceeding in which to resolve disputed issues of fact. Even assuming that Rest Haven's claims are not moot, however, the statute says nothing about exclusive jurisdiction of district courts to find facts in RFRA cases. Review of an agency action in the court of appeals surely qualifies as an Article III judicial proceeding. Nothing in RFRA purported to repeal the

authority of federal administrative agencies to find facts, subject to review by the courts of appeals; there was no silent elimination of the judicial review provisions of the Administrative Procedures Act. See 5 U.S.C. § 706. Furthermore, the fact that Rest Haven's claims against the FAA include allegations that the FAA violated the Constitution does not allow it to "bypass the administrative process" because "[t]he effect would be that important and difficult constitutional issues would be decided devoid of factual content." *Gaunce v. DeVincentis*, 708 F.2d 1290, 1293 (7th Cir. 1983) (holding that exclusive jurisdiction rested in the court of appeals in a case in which a pilot challenged an FAA order revoking her flight certificate on due process grounds); see also *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215-16 (1994) (indicating that while the "[a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies," such a "rule is not mandatory," particularly when a plaintiff's "statutory and constitutional claims can meaningfully be addressed in the Court of Appeals") (internal citations omitted).

As further support for their argument that their claims against the FAA should be heard by the federal district court, both Rest Haven and the Municipal Plaintiffs contend that the misconduct of various FAA administrators made it impossible to develop the type of factual record necessary for meaningful appellate review. The Plaintiffs charge that the FAA has developed a compensation program that provides monetary rewards for FAA officials who make decisions that allow the construction of new runway projects; that former Chicago employees (who had worked on previous O'Hare expansion projects) are currently FAA officials and employees; and that these administrators withheld thousands of documents that are not a part of the appellate record. Without the ability to present their claims to the district court, they fear, they

will be stuck with the outcome of these tainted proceedings. Appellate courts, however, are certainly competent to hear a party's argument that there were flaws in due process at the agency level and remand the case to the agency with instructions to correct these problems. Additionally, any plaintiff can make an argument to the court of appeals that there were problems with the creation of the record before the administrative agency and thus in the record on appeal. See *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468-69 (1984) ("If, however, the Court of Appeals finds that the administrative record is inadequate, it may remand to the agency, see *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 593-94 (1980), or in some circumstances refer the case to a special master, see 28 U.S.C. § 2347(b)(3)."). In fact, Plaintiffs made these arguments before the Court of Appeals for the D.C. Circuit, which rejected them. See *Bensenville*, 457 F.3d at 72-73.

Lastly, Plaintiffs argue that the district court at least has jurisdiction over their NEPA claims, pursuant to 40 C.F.R. § 1506.1. That regulation provides that "[u]ntil an agency issues a record of decision . . . no action concerning the proposal shall be taken which would [h]ave an adverse environmental impact; or [l]imit the choice of reasonable alternatives." According to Plaintiffs, the FAA has not made a substantive funding decision about the disposition of certain passenger facility charges (PFC) that amount to more than one billion dollars. This is money that the City needs to facilitate Phase One of the OMP. Without the federal money, the City cannot proceed with the implementation of Phase One, which includes the acquisition of land from the Municipal Plaintiffs. Plaintiffs argue that the City is attempting to subvert the requirements of NEPA by adhering to a policy of "destruction before decision," in disregard of this court's ruling in *Old Town Neighborhood Ass'n v. Kauffman*, 333 F.3d 732 (7th

Cir. 2003), disapproving such a strategy. The district court decided that it had no jurisdiction over this claim either.

Perhaps because events continue to unfold, the Plaintiffs' argument in this respect seems to have unraveled. The regulation to which Plaintiffs refer prohibits action in the absence of an agency's issuance of a ROD. Here, though, the ROD and the accompanying EIS have been issued. More than that, in an agreed order between these parties, the City stipulated that it "[would] not acquire property in the Village of Bensenville and Elk Grove Village for the OMP, or acquire the Rest Haven or St. Johannes Cemeteries, unless and until the FAA has issued a Record of Decision following completion of an EIS for the OMP." At oral argument the FAA directed the Court's attention to § 12.3 of the ROD where the FAA made specific factual findings on the airport layout plan's effect on natural resources, in compliance with 49 U.S.C. § 47106(c)(1)(B). Plaintiffs contend that this does not do the job, because while environmental findings have been made with respect to the airport layout plan, those findings did not focus on the specific project for which the City is seeking funding—the Phase One Project. Based on our reading of the record, however, the Phase One Project is a part of the airport layout plan for which the City has received FAA approval. Furthermore, the regulation does not prohibit action until the FAA has made *all* decisions with respect to funding; it says only that no action can be taken before the issuance of the ROD, which we now have. If these Plaintiffs wanted to challenge the environmental findings made by the FAA, they certainly could have included those claims in the petition for review of the ROD that they filed in the D.C. Circuit.

This shows Plaintiffs' NEPA challenge for what it is: a matter so intertwined with the ROD that it falls within the exclusive jurisdiction of the court of appeals. If we needed further reassurance on the point, we have it in

the fact that Plaintiffs actually made the identical argument about NEPA compliance in their presentation to the D.C. Circuit. There, they argued that the FAA violated NEPA by issuing a ROD that approved of the airport layout plan without making any formal funding decisions. Before the district court and on appeal here, they argue that the FAA is violating NEPA by allowing the City to proceed with the acquisition of property in these villages before a funding decision has been made. Even if we did not think that this issue was under the court of appeals' exclusive jurisdiction, we do not think it wise to allow either the Municipal Plaintiffs or Rest Haven to litigate the same issues, either concurrently or *seriatim*, in separate federal courts.

**IV**

We turn now to St. John's part of this case. The first question is whether St. John's is entitled, as a matter of state law, to the protection afforded by the Illinois Religious Freedom Restoration Act, 775 ILCS 35/30. If the OMA's amendment of IRFRA can withstand legal challenge, then the answer must be no; if not, then St. John's may have a point. Before the district court, St. John's argued that the OMA's amendment of IRFRA violated the Free Exercise Clause of the First Amendment. The Free Exercise Clause prohibits the government from "plac[ing] a substantial burden on the observation of a central religious belief or practice" without first demonstrating that a "compelling governmental interest justifies the burden." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989). In *Employment Division v. Smith*, 494 U.S. 872 (1990), however, the Supreme Court held that neutral laws of general applicability do not run afoul of the Free Exercise Clause, even if these laws have the incidental effect of burdening a religious practice. *Id.* at 883; see also *Church*

*of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). In order to determine whether a law is neutral, as the Court used the term in *Smith*, we must examine the object of the law. A law is not neutral if "the object of the law is to infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. The related principle of "general applicability" forbids the government from "impos[ing] burdens only on conduct motivated by religious belief" in a "selective manner." *Id.* at 543; see also *id.* at 531 ("Neutrality and general applicability are interrelated, and failure to satisfy one requirement is a likely indication that the other has not been satisfied.").

The Illinois legislature passed IRFRA in 1998 in response to both *Smith* and the Supreme Court's subsequent invalidation (as applied to the states) of the federal Religious Freedom and Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb, *et seq.* See *City of Boerne v. Flores*, 521 U.S. 507 (1997) (holding that RFRA, as it applied to the states and their subdivisions, exceeded Congress's remedial powers under the Fourteenth Amendment). RFRA had been Congress's attempt to impose what it understood to be the pre-*Smith* "compelling interest test" to state measures affecting religious practices. Under RFRA, a governmental unit could not "substantially burden a person's exercise of religion even if the burden result[ed] from a rule of general applicability . . . unless [the government's action was] in furtherance of a compelling governmental interest and [was] the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000bb-1; see also *Sherbert v. Verner*, 374 U.S. 398 (1963); *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

Since the holding of *Boerne* was predicated on the scope of Congress's powers under section 5 of the Fourteenth Amendment, the Illinois legislature reasonably con-

cluded that *Boerne* said nothing about its own ability under Illinois's Constitution to enact a measure affording special protection to religion. It did so in IRFRA, using language that mirrors that of the federal RFRA. See 775 ILCS 35/15 ("Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest."). The legislation was expressly designed to afford greater protection to religious activity in Illinois than *Smith* holds is required under the federal Constitution. The legislature acted again in the OMA, however, taking back part of what IRFRA gave: it put religious institutions on the same footing as all other property owners for purposes of the O'Hare project. The OMA accomplishes this goal by adding a new § 30 to IRFRA; the new section states that nothing in IRFRA "limit[s] the authority of the City of Chicago to exercise its powers under the [OMA] for the purpose of relocation of cemeteries or graves located therein." 775 ILCS 35/30. As St. John's points out, the OMA also mentions cemeteries in § 92, which amends the Illinois Municipal Code, 65 ILCS 5/11-51-1, by allowing the City to remove cemetery remains for airport expansion without the assent of cemetery trustees or owners.

According to St. John's, a major tenet of its religious beliefs is that the remains of those buried at the St. Johannes Cemetery must not be disturbed until Jesus Christ raises these remains on the day of Resurrection. It asserts therefore that the City's plan to acquire and condemn the cemetery is a "sacrilege to [its] religious faith." We accept those representations. St. John's continues with a claim that the OMA impermissibly targets the religious cemeteries adjacent to O'Hare, stripping

them of the protection under IRFRA that is afforded to every other religious institution, including other religious cemeteries, in Illinois. The district court decided, however, that this was the wrong perspective: it saw no discrimination or targeting of religious institutions because *any* property, religious or otherwise, within the area designated for O'Hare expansion is subject to the extraordinary powers conferred in the OMA. It therefore dismissed all counts in the first amended complaint that asserted a free exercise violation and similarly denied the motion for leave to file a second amended complaint with respect to the free exercise claims, concluding that the Plaintiffs failed to state any free exercise claim on these facts.

Throughout these proceedings, St. John's has insisted that the relevant comparison is between the two cemeteries potentially affected by the O'Hare project and all other cemeteries or religious properties in the state. But this assumes the answer to the crucial question: what is the proper comparison to make?[2] *Lukumi* requires us to approach that question by asking whether the object of the OMA was "to infringe upon or restrict practices because of their religious motivation." 508 U.S. at 533. In looking at OMA, we must consider the act as a whole, as well as the part that the new § 30 of IRFRA (added by § 96 of the OMA) plays in it.

We begin, as *Lukumi* instructs, with the text of the OMA. As we noted earlier, the new § 30 of IRFRA says simply "Nothing in this Act limits the authority of the City of Chicago to exercise its powers under the O'Hare Modernization Act for the purposes of relocation of ceme-

---

[2] Our dissenting colleague answers this critical question in St. John's favor. For the reasons we set forth in the discussion that follows, we conclude that the City has the better of the argument.

teries or the graves located therein." In our view, this language does not "refer[ ] to a religious practice without a secular meaning discernible from the language or context." *Lukumi*, 508 U.S. at 533. Some cemeteries are affiliated with religious sects, others are not; even graves in cemeteries with a religious affiliation may be relocated because of natural necessity, for public health concerns, after a hurricane or flood, or for many other private or public reasons. We conclude there is nothing inherently religious about cemeteries or graves, and the act of relocating them thus does not on its face infringe upon a religious practice, as *Lukumi* uses that term. (We acknowledge the fact that the OMA addresses only cemeteries that are entitled to invoke the protections of IRFRA, but that is only because secular cemeteries presumably would have no extraordinary defense to the power of eminent domain to begin with.) We note in this connection that the Supreme Court held in *Lukumi* that the words "sacrifice" and "ritual" were not so closely associated with religious practice that a finding of facial non-neutrality was compelled. *Id.* at 534. If that was the case there, then it is straightforward here to conclude that the OMA is facially neutral.

Even if a law passes the test of facial neutrality, it is still necessary to ask whether it embodies a more subtle or masked hostility to religion. See, *e.g.*, *Gillette v. United States*, 401 U.S. 437, 452 (1971) (indicating that the Free Exercise Clause "forbids subtle departures from neutrality"); see also *Bowen v. Roy*, 476 U.S. 693, 703 (1986) (noting that the First Amendment prohibits the government from engaging in the "covert suppression of particular religious beliefs"). To answer that question, we must look at available evidence that sheds light on the law's object, including the effect of the law as it is designed to operate, the "historical background of the decision under challenge, the specific series of events leading to the

enactment or official policy in question, and the [act's] legislative or administrative history." *Lukumi*, 508 U.S. at 540. Perhaps the most important of these sources is the remainder of the statute of which the new § 30 is a part. The OMA in its entirety is the law that the Illinois General Assembly passed; by relying on it we do not run the risk of selective use of statements in legislative history that might not reflect the intent of the legislature. The Supreme Court took this approach when it reviewed the Free Exercise and Establishment Clause claims in *Locke v. Davey*, 540 U.S. 712 (2004). There, although the petitioner challenged only the specific statutory provision of a scholarship program that prohibited recipients from pursuing post-secondary degrees in theology, the Court observed that "the *entirety* of the Promise Scholarship Program goes a long way toward including religion in its benefits." *Id.* at 724 (emphasis added).

Although St. John's alleges in its complaint that the City targeted its religious rights when the City asked the Illinois General Assembly to amend IRFRA as part of the OMA, in reviewing the sufficiency of the complaint "we are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002). There are simply no facts in the voluminous record on appeal that support any such claim of targeting religious institutions or practices. According to its stated purpose, the OMA was enacted, in part, to insure that "legal impediments to the completion of the [O'Hare] project be eliminated." OMA § 5(b). As we noted earlier, most of the OMA's provisions have absolutely nothing to do with religion, cemeteries, or IRFRA. See, *e.g.*, *id.* § 20 (prohibiting local government units, other than the City of Chicago, from condemning property that is slated to become part of O'Hare); *id.* § 94 (amending the Illinois Aeronautics Act, 620 ILCS 5/38.01, to exempt project applications under the provisions of the

Airport and Airway Improvement Act submitted in con-
nection with the OMP from the general requirements for
such applications); *id.* § 95 (amending the Illinois Code of
Civil Procedure to include a quick-take provision for
property condemned for the OMP). In fact, the record as
a whole strongly supports the position the City has urged
throughout these proceedings: the OMA was designed to
remove any and all state-law based impediments to the
O'Hare expansion project, no matter what their source.

St. John's makes the obvious point that, as matters have
developed, it is now the only cemetery in the State of
Illinois affected by the new § 30 of IRFRA. That is true,
but an "adverse impact will not always lead to a finding of
impermissible targeting." *Lukumi*, 508 U.S. at 535. In fact,
if this point matters at all, it may cut in favor of the
City. As St. John's repeatedly mentions in its brief, no
other religious cemetery in Illinois, including other
cemeteries similarly affiliated with the United Church of
Christ, is affected by the OMA. The fact that the legisla-
tion leaves other religious cemeteries untouched (includ-
ing those affiliated with churches or other religious
institutions that hold similar beliefs with respect to
burial grounds) reinforces the proposition that the legisla-
ture had the nondiscriminatory purpose of clearing all
land needed for O'Hare's proposed expansion. If there
were ten cemeteries in that area, then the new § 30 would
apply to all ten; while there were two, it applied to both.
We conclude that the OMA, including the portion that
amends IRFRA, is a neutral law of general applicability.
The Illinois legislature was entitled to restore Illinois law
to the regime governed by *Smith* in order to facilitate the
airport project.

Although we think it unnecessary to ask whether the
plan passes the strict scrutiny test, and whether the City
has shown that it is the least restrictive means of fur-
thering a compelling governmental interest, we add for

the sake of completeness that we agree with the FAA's conclusion in the ROD that the plan passes muster. Unlike our dissenting colleague, we see no disputed issues of material fact that would require further proceedings.

Virtually all involved parties, from the competent committee in Congress, to the FAA, to the State of Illinois, to the City of Chicago, have made a compelling case that the OMP addresses a serious problem with national—indeed international—consequences. O'Hare is a vital transportation link for the Midwest region, for North America, and for the world. It is the only airport in the United States that is the hub of two major airlines. Serving 47 scheduled passenger airlines and 23 cargo carriers, O'Hare provides nonstop service to 127 domestic and 48 international destinations. In part because Chicago is the largest population and economic center in the middle of the country, O'Hare "plays an important role in the National Airspace System (NAS) as a dual airline hub, a major mid-continent market for nearly every major airline, and a key international gateway."

O'Hare is not only one of the busiest airports in the world. Unfortunately, recently it has also become one of the most congested. Its delay record is at least twice as bad as that of the next two airports that suffer from excessive delays, Atlanta and Newark. Nearly 70,000 airport operations at O'Hare were delayed in 2004, for a total of almost 4,000,000 minutes. As the OMA states, "The reliability and efficiency of air transportation for residents and businesses in Illinois and other States depend on efficient air traffic operations at O'Hare." 620 ILCS 65/5. Approximately 51% of total passengers traveling through O'Hare connect to and from other airports. As a major international gateway, the effects of the congestion at O'Hare are far-reaching. Delays at O'Hare spark further delays around the country and the world, with serious economic and logistical consequences. Ac-

cording to the ROD, "O'Hare has consistently been the number one problem related to delays with the National Airspace System in the United States today." Moreover, the problem seems unlikely to abate; the FAA believes that "[a]ir traffic at O'Hare is projected to increase in the future from some 31 million passengers and 922,787 operations in 2002 to some 50 million passengers and 1,194,000 operations by 2018." Many who have tried to connect through O'Hare have learned the hard way that the airport simply lacks the capacity to accommodate all the demand for its services. It is for these reasons that the FAA concluded that the state interests at stake are compelling and agreed to fund one of the largest and most costly reconfigurations of an airport in the United States.

The routes and networks that have developed around O'Hare are vast and entrenched. The FAA considered the option of diverting air traffic to other regional airports or mid-continent hubs, but it found that local, national and international dependence on O'Hare as a national connecting hub and international gateway had developed to the point of making those ideas effectively unworkable. To borrow a concept from the "essential facilities" doctrine in antitrust law, as a practical matter it is impossible reasonably to duplicate O'Hare in a way that meets the crushing demand for its important services. Compare *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1132 (7th Cir. 1983). If the decision were ours to make (a proposition that we find doubtful), rather than that of the FAA or the competent authorities in Chicago and Illinois, we would find that there really is "no realistic, economically practical alternative," *City of Malden, Missouri v. Union Electric Co.*, 887 F.2d 157, 163 n.6 (8th Cir. 1989), to the restructuring of O'Hare to remedy those concerns. Given O'Hare's unique importance to the national transportation infrastructure, we are persuaded that the City and

State have a compelling interest in fixing the problems from which O'Hare suffers.

Even if the need is compelling, if IRFRA applied it would be necessary to decide whether the OMP is the least restrictive alternative. St. John's has offered no plausible evidence to suggest that it is not. See *Bell Atlantic*, 127 S. Ct. at 1974. The City and its many partners carefully considered the concerns of the religious entities in an exhaustive review. They studied the alternatives thoughtfully, adopted some of them, and came up with a final plan that represents the City's best effort to be solicitous of the religious concerns involved without substantially undermining the goals of the overall project. See *Bensenville*, 457 F.3d at 72 (stating that the FAA "appears to have acted with great care in conducting its analyses for the EIS and ROD" in this case). Cf. *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 453-55 (1988) (noting that where the government commissioned a comprehensive study of the effects its proposed road would have on the religious concerns at issue and had planned numerous ameliorative measures to mitigate the intrusion as much as possible, "it is difficult to see how the Government could have been more solicitous"). The City discarded its original plan to relocate air cargo facilities to the Rest Haven site, after the FAA concluded that "there is a measure of flexibility in the design and location of these buildings sufficient to accommodate the religious liberty interests without impeding the air cargo component" of the overall plan. Accordingly, Rest Haven was spared in an effort to tailor the plan in as accommodating a manner as possible.

Unfortunately, geography and the needs of the expansion project made it impossible similarly to accommodate the St. Johannes cemetery. The FAA's review of alternative proposals illustrates, however, that this conclusion was not reached lightly. The proposals attempted to

minimize encroachment on the St. Johannes cemetery as much as possible by considering options that would have shifted, shortened, or eliminated various runways or other parts of the overall plan. For example, one alternative called for moving a key runway about 400 feet to the south and shortening it to avoid the St. Johannes cemetery. The FAA found that doing so would have moved the runway into protected space for a new air control tower that could not be moved without running afoul of FAA safety standards. According to the ROD, the ultimate result would have "compromis[ed] the efficiency and capacity of [other] runways in poor weather." The ROD noted that the responses to these concerns "demonstrate[d] an unfamiliarity with the real-world situation of operating a major airport in both a safe and efficient manner." Another proposal suggested simply shortening the runway without moving it to another part of the airport. The FAA found that this alternative would "place severe operating constraints on the airfield any time weather conditions presented a ceiling below 4,500 feet and less than 7 miles of visibility" which "would not accommodate anticipated growth in aviation activity at acceptable levels of delay."

More creative possibilities were considered as well, such as simply constructing a necessary runway on the surface of the cemetery ground without disturbing the bodies underneath. Even though this would have made access to and future use of the cemetery impossible and may also have offended religious sensibilities, some thought that this proposal was less restrictive because the bodies would remain untouched. The FAA consulted the Tennessee Valley Authority, a federal agency with considerable experience in cemetery relocation (derived over many years of building hydro-power facilities in areas where cemeteries were located), about this idea. The concept proved to be infeasible as a matter of engineering. The

FAA concluded that "the depth of excavation needed for runway construction, along with the ancillary activities such as electrical cabling for airfield runway lighting and storm sewer pipes for airfield drainage, presented a substantial likelihood that the graves could be disturbed."

It is significant that this case involves physical intrusion on a religious site, not the curtailment or prohibition of a religious practice. The least restrictive alternative analysis here comes down to concrete measurements. The question is whether there is a way to construct the vitally needed new runways and supporting structures at O'Hare—a defined physical space—in a way that limits or avoids entirely physical encroachment on an adjacent geographical area. An airport layout and runway configuration is an intricate web of interrelated parts where placements and measurements are carefully calibrated to account for variables such as wake turbulence, weather, and visibility, as well as the size, speed, and schedules of departing and arriving aircraft. The entire project is constrained by demanding FAA standards. As the ROD explains, "a change in one runway often has consequences for other runways, nearby taxiways, and the overall ability to handle greater levels of traffic." Each alternative proposal fell victim to that reality. The City has demonstrated that it has accommodated the religious concerns as much as is physically possible without compromising its compelling interests. The only plausible conclusion that the pleadings support is that the OMP represents the least restrictive alternative.

Lastly, St. John's argues that the district court erred in concluding that in order to state a free exercise claim a plaintiff must allege two things: (1) that the defendant's actions were motivated by animus or prejudice, and (2) that the law at issue is not neutral or of general applicability. The first of these, it asserts, is precluded by cases such as *Shrum v. City of Coweta, Okla.*, 449

F.3d 1132 (10th Cir. 2006). There, the Tenth Circuit observed that "the Free Exercise Clause has been applied numerous times when government officials interfered with religious exercise not out of hostility or prejudice, but for secular reasons." *Id.* at 1144.

With respect, we think that St. John's has misread the district court's opinion. Only after the court decided that the OMA was a neutral law of general applicability did it observe that "none of the allegations in the complaint give[s] rise to the inference that the facially neutral language masks more insidious underpinnings." This comment reflects the inquiry required by *Lukumi*. The district court was not suggesting that a plaintiff is *required* to allege animus or prejudice in order to state a free exercise claim.

In fact, a closer look at *Shrum* reveals that it is not of much help to St. John's. In that case, the plaintiff, a police officer and minister, alleged that he was assigned to a day shift precisely because this schedule would conflict with his ministerial duties. Although the defendant gave a neutral justification for the assignment, the plaintiff's allegation was that the decision to reassign him was "motivated by [plaintiff]'s religious commitments." *Id.* at 1144. A question therefore existed with respect to whether the decision at issue was actually neutral and of general applicability; the court had no need to require the plaintiff also to allege that the assigning officer had held his faith against him or had acted out of religious prejudice. The problem was that the assigning officer wanted to force the plaintiff to choose between his duties as a police officer and his post as a minister and "religious discrimination was the means to [that] entirely secular end . . . ." *Id.* Here, in contrast, St. John's does not allege that the City is seeking to acquire its land *because* of its religious significance; the City needs the land *in spite*

*of* its current dedication to religious use. *Cf. Personnel Adm'r. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.") (internal citation omitted). There are no facts in this record that could support such a claim.

## V

Moving on from its free exercise challenge to the OMA's amendment of IRFRA, St. John's argues that the OMA violated the Fourteenth Amendment's Equal Protection Clause when it deprived St. John's of constitutional and statutory legal protections that are available to every other cemetery in the state. The district court dismissed this aspect of the case, in both the original and the second amended complaint, for failure to state a claim upon which relief could be granted. The court's error in this respect, according to St. John's, was its failure to review the equal protection theory using strict scrutiny.

In deciding whether the OMA violates the Equal Protection Clause, our first question is whether the act targets a suspect class or addresses a fundamental right. See *Eby-Brown Co., LLC v. Wisc. Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002). If it does either of these things, then the legislation must survive more demanding scrutiny. Normally, this means that it must be tailored narrowly to facilitate a compelling state interest. See *Krislov v. Rednour*, 226 F.3d 851, 863 (7th Cir. 2000). If no fundamental rights or suspect categories are at issue, "[t]he general rule is that legislation is presumed to be valid

and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

St. John's first tries to repackage its free exercise argument in equal protection language, by claiming that the new § 30 unduly burdens its fundamental right freely to exercise its religion. We have already rejected the underlying point, however. "Where a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts." *Wirzburger v. Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005) (citing *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974)).

St. John's also argues that the new § 30 targets a suspect class, namely, the two religious cemeteries adjacent to O'Hare. It has not fleshed out this argument particularly well. If it means to suggest that "cemeteries adjacent to O'Hare" constitute a constitutionally suspect class, we must disagree with it. A suspect class either "possesses an immutable characteristic determined solely by the accident of birth," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), or is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). Although religion may fit the bill, see, *e.g.*, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), strict scrutiny has been reserved for laws that "discriminat[e] among religions." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327,

339 (1987). The new § 30 neither classifies on the basis of religion nor discriminates among religions.

Once again, St. John's notes that it is the only religious cemetery currently affected by the OMA; other religious cemeteries in the state, including those affiliated with the United Church of Christ, are beyond the statute's reach. As was the case with respect to its free exercise claim, St. John's own argument proves that this statute does not treat St. John's differently from other religious cemeteries in the state *because* it is a religious cemetery. Rather the statute puts St. John's in a different position from other religious cemeteries in the state because it is near O'Hare and, unlike the Rest Haven Cemetery, the City badly needs the land to construct additional runways. Geography, however, is not a suspect class for equal protection purposes. If St. John's is attempting to state a "class of one" equal protection claim, see *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), it has failed to do so. This court has held that "[a] class of one equal protection claim may be brought where (1) the plaintiff alleges that he has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant." *Lunini v. Grayeb*, 395 F.3d 761, 768 (7th Cir. 2005) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004)). Even if St. John's could satisfy the first part of that test, it cannot survive the second part.

The fact that this statute affects a religious group or institution does not necessarily mean that the statute classifies on the basis of religion. See, *e.g.*, *Johnson*, 415 U.S. at 375 n.14 (declining to categorize group of religious conscientious objectors as a suspect class); *Locke*, 540 U.S. at 712 (applying rational basis review to a statute that prohibited state aid to any post-secondary student pursu-

ing a degree in theology). As we observed earlier, in a case like this, where a facially neutral statute is challenged on equal protection grounds, the challenger must prove that the legislature "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279. Nothing supports the proposition that the Illinois legislature singled out St. John's for lesser protection under IRFRA protection *because* it runs a religious cemetery. Anyone or anything standing in the way of the O'Hare project faces the prospect of the City's exercise of its eminent domain power. We have no doubt that the legislature was unmoved by St. John's religious affiliation.

In order to survive a motion to dismiss for failure to state an equal protection claim, "a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992). As the district court observed, St. John's does not even attempt to argue that the OMA's amendment to IRFRA is not rationally related to some legitimate government purpose. Certainly, the expansion of O'Hare is a legitimate state purpose. As a classic "public use"—an airport to be operated by the City of Chicago for the benefit of local, national, and international transportation—it does not raise any of the questions that concerned the dissenting Justices in the Supreme Court's decision in *Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005). Enacting a statute that removes legal barriers to the City's ability to acquire land in connection with the expansion of the airport is not "wholly impossible" to relate to that legitimate interest. *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 766 (7th Cir. 2003).

**VI**

Last, St. John's invokes the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.* Congress enacted RLUIPA after the Supreme Court invalidated the federal RFRA, 42 U.S.C. § 2000bb, *et seq.*, as it applied to the states and their subdivisions in *City of Boerne*, 521 U.S. 507. "Less sweeping" than RFRA, RLUIPA is limited to cases involving land use regulations or the religious exercise rights of institutionalized persons. It applies when a substantial burden to religious exercise is "imposed in a program or activity that receives Federal financial assistance," affects interstate commerce, or, in a case involving a land use regulation, is imposed pursuant to a procedure that permits the government to make "individualized assessments of the proposed uses for the property involved." 42 U.S.C. §§ 2000cc-1(b)(1)-(2), 2000cc(a)(2)(A)-(C).

The question before us is whether the "land use" part of RLUIPA applies here. That part of the statute prohibits any government from implementing a "land use regulation" that "imposes a substantial burden on the religious exercise of a person," as well as on religious assemblies and other religious institutions, unless the government can show that the "imposition of the burden on that person, assembly, or institution is in furtherance of a compelling governmental interest [ ] and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1). We must decide whether the City's plan to condemn the St. Johannes Cemetery is a "land use regulation" within the meaning of RLUIPA. We agree with the district court's conclusion that it is not.

Initially, we note that we are proceeding on the assumption that RLUIPA as a whole does constitutionally apply to the states. In *Cutter v. Wilkinson*, 544 U.S. 709 (2005),

the Supreme Court held that § 3 of RLUIPA, which deals with the religious exercise rights of institutionalized persons, is constitutional as applied to the states. The Court specifically declined to express any view on the validity of § 2 of the statute, which deals with land use regulations. 544 U.S. at 715 n.3. Neither party has raised any challenges to the constitutionality of § 2; because we conclude that the statute does not apply here, we save for another day the question whether this part of the statute may be applied to the states.

The term "land use regulation" is defined by RLUIPA as follows:

> [A] zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

42 U.S.C. § 2000cc-5(5). St. John's (as well as the Municipal Plaintiffs and Rest Haven, for that matter) have not objected, however, to any plan on the City's part to zone their property in an unfavorable way or to impose restrictions on it under a landmarking law. St. John's claims instead that the OMA is a "zoning-type law" because it changes the permitted use of its land from a religious cemetery to land designated as "airport property." But this is a misleadingly incomplete description of the City's intentions under the statute. The fact that the OMA refers to the land it seeks to acquire from everyone living within the footprint of the O'Hare expansion project as "airport property" does not morph the OMA into a zoning ordinance. The City is not attempting to dictate to these plaintiffs what they are permitted to do with the plot of land that is currently the St. Johannes Cemetery; rather,

the City seeks to exercise its takings power to assume full ownership of the land, after paying St. John's just compensation. As Illinois courts have long recognized, the "police power [zoning] and eminent domain are distinct powers of government." *Sanitary Dist. of Chi. v. Chi. & Alton R.R. Co.*, 108 N.E. 312, 314 (Ill. 1915) ("Whatever restraints the Legislature imposes upon the use and enjoyment of property with the reason and principle of this duty the owner must submit to. It is a regulation, and not a taking; an exercise of police power, and not of eminent domain."). Because zoning and eminent domain are "two distinct concepts" that involve land "in very different ways," we reject the argument that the City's plan to condemn the St. Johannes Cemetery under the OMA is an act of zoning. *Faith Temple Church v. Town of Brighton*, 405 F. Supp. 2d 250, 254 (W.D.N.Y. 2005).[3]

---

[3] Some argue that the two concepts are not so distinct, and that the problem with zoning is that it forces property owners to limit the uses to which they put their property. In that sense, the argument goes, zoning regulations are in fact partial takings of private property. See Richard A. Epstein, *Takings: Private Property and the Power of Eminent Domain* 100-03 (1985).

Professor Epstein argues that what government should do in lieu of zoning is use its power of eminent domain, assuming of course that there is a valid public purpose and the government is willing to pay. He recognizes that the law has not adopted his theory, however, noting that "the dominant line of opinion—one that can be traced to Justice Holmes in [*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)]—is that regulation, far from being a subclass of takings, is outside the scope of the eminent domain clause unless it is taken 'too far.'" *Id.* at 102.

St. John's argument runs in the other direction; it claims that the exercise of eminent domain in this case has essentially zoned away its entire property. But the City has paid just compensation for what it has taken in this case, which is exactly what

(continued...)

St. John's relies on a district court case from the Southern District of Indiana for the sweeping proposition that "[w]hen an ordinance constitutes an attempt by the government to regulate the use of a piece of property, it is an act of zoning." *Sagamore Park v. City of Indianapolis*, 885 F. Supp. 1146, 1150 (S.D. Ind. 1994). That decision, however, is inapposite. It addressed the question whether a moratorium imposed by the Board of Zoning Appeals amounted to an act of zoning; it had nothing to do with the question whether an exercise of the sovereign power of eminent domain should also be regarded as "zoning."

In addition to arguing that the OMA is a zoning law, the Plaintiffs contend that eminent domain itself is a "land use" regulation under RLUIPA. Their best authority for this point is a footnote in a district court case from the Central District of California, *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D. Cal. 2002). Briefly, in that case, the plaintiff, Cottonwood Christian Center, wanted to build a church on an 18-acre parcel of land that it owned. The City of Cypress planned to use that land for commercial retail space and initiated eminent domain proceedings. The plaintiff brought an action for a preliminary injunction after the City denied it the necessary land use permit it needed to begin constructing its place of worship. The district court found that the City's refusal to grant Cottonwood's application for a conditional use permit was a land use regulation subject to RLUIPA. In a footnote, the court commented that "[e]ven if [it] were only considering the condemnation proceedings, they would fall under

---

[3] (...continued)
distinguishes it from a zoning regulation that has gone "too far." It would strain the statutory definition beyond repair to equate a buy-out with a "limitation" or "restriction" on land use.

RLUIPA's land use regulation." *Cottonwood*, 218 F. Supp. 2d at 1222 n.9.

We are not persuaded by the district court's brief dicta in *Cottonwood* that eminent domain is always and inevitably a land use regulation under RLUIPA. Given the importance of eminent domain as a governmental power affecting land use, we think that if Congress had wanted to include eminent domain within RLUIPA, it would have said something. Indeed, before federal law (even under the Spending Clause) starts interfering with the fundamental state power of eminent domain, it is likely that we would need a clear statement from Congress. See, *e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) ("[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.") (internal quotation omitted). Congress did not mention eminent domain in so many words in RLUIPA's definition of a land use regulation, which is enough for us to consider it excluded. See *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that where the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms."). The handful of federal and state cases that have addressed this question have reached the same conclusion that we have. See, *e.g.*, *Faith Temple Church*, 405 F. Supp. 2d at 255 ("By its terms . . . RLUIPA does not apply to eminent domain proceedings."); *City and County of Honolulu v. Sherman*, 129 P.3d 542, 547 (Haw. 2006) ("RLUIPA is not available as a defense to condemnation . . . ."); see also *Prater v. City of Burnside, Ky.*, 289 F.3d 417, 434 (6th Cir. 2002) (although not specifically addressing the question whether condemnation is a land use regulation under RLUIPA, indicating that the City's property interest in the land at issue gave it the right to develop the land as it desired and thus the City's decision

to develop the roadway was not based on any zoning or landmarking law). Because this case does not involve a "land use regulation," there is no need for us to address RLUIPA's other element—whether the City's proposed actions will substantially burden Plaintiffs' religious exercise.

With RLUIPA inapplicable, we have exhausted the possible reasons why the St. Johannes Cemetery might be exempt from the City's general eminent domain power. Over the years, Illinois has condemned cemeteries, both religious and otherwise, for a variety of public uses, such as highways. See, *e.g.*, *Illinois State Toll Highway Comm'n v. Eden Cemetery Ass'n*, 158 N.E.2d 766 (Ill. 1956) (oft-cited case about the appropriate uses of the state's eminent domain power involving condemnation of a religious cemetery); *Dep't of Transp. v. Bouy*, 386 N.E.2d 1163 (Ill. App. Ct. 1979) (resolving methods government was required to use to determine the market value and appropriate compensation for the partial taking of a cemetery to provide land for a highway). We recognize that relocating St. Johannes will be a sensitive and labor intensive task. The City has established a detailed protocol, which includes identifying the next of kin for each person buried at the cemetery and hiring professional archaeologists and a licensed funeral director to carry out archaeological work and disinterments for each person buried there. At oral argument, the City assured us that it will comply with these procedures. We take the City at its word and trust that this process will be carried out with dignity and respect for both living and dead. Of course, the plaintiffs remain free to challenge any deviation from the City's proposed methods of relocation before an appropriate tribunal should some controversy arise in the future.

Given our conclusion that none of St. John's religious claims against the City survives, the district court was correct to deny its motion for a preliminary injunction.

## VII

Accordingly, we AFFIRM the judgment of the district court.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I join my colleagues in affirming the judgment of the district court with respect to the claims by Rest Haven and the municipal defendants. However, I believe that the amendments to the Illinois Religious Freedom Restoration Act ("Illinois RFRA") made in the O'Hare Modernization Act ("OMA"), Ill. Pub. Act No. 093-0450, violate the Free Exercise Clause, and, for that reason, must be subject to strict scrutiny. I further believe that there remain factual questions regarding whether the City of Chicago ("City") has shown that the proposed modernization and expansion plan of O'Hare Airport is narrowly tailored to meet the compelling interest the City claims. These factual issues render dismissal inappropriate at this stage in the litigation. Therefore, I respectfully dissent.

## I

## BACKGROUND

The majority's thoughtful and comprehensive opinion sets forth the facts of this case in great detail; therefore, I shall provide only a brief description of the pertinent facts.

In May 2003, the Illinois General Assembly enacted the OMA. The legislation amended various provisions of Illinois law to facilitate the planned expansion of O'Hare Airport. One of the legal impediments that this legislation sought to remove was a restriction on the power of the City to condemn particular properties for the expansion, including two religiously-affiliated cemeteries, one of which, St. Johannes Cemetery ("St. Johannes"), is owned by St. John's United Church of Christ ("St. John's"). Among the changes aimed at facilitating the condemnation of these cemeteries was an amendment to the Illinois RFRA that repealed otherwise generally applicable statutes only with respect to the relocation of cemeteries in connection with the O'Hare expansion.

St. John's and two of its congregants[1] filed this action, challenging both the City's attempt to acquire the land on which St. Johannes is located and the amendment to the Illinois RFRA. St. John's asserted that the City's actions violated its rights under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.[2] St. John's maintains that the relocation of St. Johannes would violate a major tenet of its religious beliefs, which requires that those buried in St. Johannes must remain undisturbed until resurrected by Jesus Christ on the Last Day. St. John's further contended that, because the amendments to the Illinois RFRA singled out religious cemeteries near

---

[1] Because the congregants assert the same claims as St. John's, I shall refer, for ease of reference, to the plaintiffs collectively as St. John's.

[2] The owner of the second cemetery, Rest Haven Cemetery Association, originally joined St. John's in these claims. As noted by the majority opinion, the City no longer seeks to acquire the land on which Rest Haven is located, rendering Rest Haven's challenges moot.

O'Hare, the law was not neutral and of general applicability, and therefore subject to strict scrutiny under the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

The district court dismissed St. John's complaint for failure to state a claim. The district court concluded that the OMA was a neutral law of general applicability; thus, it was subject only to rational basis scrutiny under both the Free Exercise Clause and the Equal Protection Clause.

## II

## DISCUSSION

The First Amendment ensures religious freedom by firmly committing the state to a position of neutrality in the relationship between individuals and religion. *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 226 (1963). The Supreme Court has observed that, with respect to religious freedom, the principle of government neutrality, the government "protect[s] all, it prefers not, and it *disparages* none." *Id.* at 215 (quoting *Minor v. Bd. of Educ. of Cincinnati* (Super. Ct. of Cincinnati, February 1870) (Taft, J., dissenting) (unpublished case), reproduced in *The Bible in the Common Schools* (Robert Clark & Co. ed., 1870)). The Free Exercise Clause advances the command of government neutrality by securing "religious liberty in the *individual* by prohibiting any invasions thereof by civil authority" and protecting against the coercive effect of legislation "as it operates against him in the practice of his religion." *Schempp*, 374 U.S. at 223 (emphasis added); *see also Jimmy Swaggart Ministries v. Bd. of Equalization of California*, 493 U.S. 378, 384 (1990); *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 996 (7th Cir. 2006). At a minimum, the Free Exercise Clause protects against laws that "discriminate[ ] against some or all religious

beliefs." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993).

State action that offends the Free Exercise Clause must satisfy strict scrutiny, i.e., be narrowly tailored to serve a compelling state interest. *See Vision Church*, 468 F.3d at 996; *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 763 (7th Cir. 2003). Additionally, when a legislative classification offends a fundamental right, such as the Free Exercise Clause, an equal protection challenge to that classification is subject to strict scrutiny. *Vision Church*, 468 F.3d at 1000. A law offends the Free Exercise Clause and its requirement of government neutrality with respect to religion in two circumstances. First, a law that burdens the free exercise of religion and that is not facially neutral and of general applicability will be subject to strict scrutiny. *City of Hialeah*, 508 U.S. at 531-32; *Vision Church*, 468 F.3d at 996. Second, a facially-neutral law that "imposes a substantial burden on religion" offends the Free Exercise Clause and likewise is subject to strict scrutiny. *Vision Church*, 468 F.3d at 996. The OMA's amendment to the Illinois RFRA violates the Free Exercise Clause under either of these approaches.

A law is not neutral on its face if its object or purpose "is the suppression of religion *or religious conduct*." *City of Hialeah*, 508 U.S. at 533 (emphasis added). To determine whether a law is neutral and of general applicability, we first look to the text of the statute to determine whether it discriminates on its face. *Id.* "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from language or context." *Id.* Applying these standards, it is clear that the OMA's amendment to the Illinois RFRA is not facially neutral. OMA added a new section 30 to the Illinois RFRA which reads:

> Nothing in this Act limits the authority of the City of Chicago to exercise its powers under the O'Hare Modernization Act for the purposes of relocation of cemeteries or the graves located therein.

775 ILCS 35/30. The panel opinion determines that, because cemeteries and the burial, or relocation, of the dead are not inherently religious, the amendment to the Illinois RFRA is textually neutral. However, this analysis fails to appreciate that, when read in context, the new section 30 of the Illinois RFRA affects only religious cemeteries. The phrase "this Act" in the new section 30 refers to the Illinois RFRA. *See id.* 35/1. The Illinois RFRA, in turn, protects against government actions that substantially burden an individual's free exercise of religion, *id.* 35/15, which the Illinois RFRA defines as "an act or refusal to act that is substantially motivated by religious belief, *id.* 35/5. Thus, the *only* cemeteries affected by OMA's amendment to the Illinois RFRA are those *religious* cemeteries that the City may seek to relocate. Moreover, because the Illinois RFRA's protections apply only where the government action substantially burdens an individual's free exercise of religion, the amendment affects only those religious cemeteries whose relocation would substantially burden an individual's free exercise of religion.

The effect of the amendment is to remove from the protections afforded to every other individual's religious observance, those individuals whose religious practices would be substantially burdened by the relocation of cemeteries in connection with the expansion of O'Hare. The OMA amendment to the Illinois RFRA offends the Free Exercise Clause by penalizing those individuals whose religious observance is affected by the expansion project by denying them "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S.

439, 449 (1988). Illinois RFRA demands that the government show a compelling interest and the lack of viable alternative before it burdens anyone's religious beliefs. By the amendment, Illinois has watered down, significantly, the protection afforded these plaintiffs. It does not matter that Illinois has not chosen to single out the United Church of Christ (the faith with which St. John's is affiliated) for unfavorable treatment across the state. The Free Exercise Clause protects the *individual's* right to the free exercise of religion. *See Jimmy Swaggart Ministries*, 493 U.S. at 384; *Schempp*, 374 U.S. at 223. Thus, the OMA's amendment to the Illinois RFRA both burdens the free exercise of religion and lacks facial neutrality, and, therefore, strict scrutiny must be applied to the amendment.

However, even if the amendment to the OMA was facially neutral, it would still be subject to strict scrutiny because it imposes a substantial burden on religion. As the Supreme Court said in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993):

> Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause "forbids subtle departures from neutrality," *Gillette v. United States*, 401 U.S. 437, 452 (1971) and "covert suppression of particular religious beliefs," *Bowen v. Roy, supra*, at 702 (opinion of Burger, C.J.). Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.

*See also Vision Church*, 468 F.3d at 996. We have held that a burden on the free exercise of religion rises to the level of a constitutional injury when the law places significant pressure on the adherent to forego its religious precepts. *Id.* at 999. The effect of relocating St. Johannes on St.

John's religious observance is neither hypothetical nor speculative, but, rather, inescapable. The relocation of St. Johannes would force St. John's to forego its religious precepts regarding the burial of its members. This burden goes further than placing pressure on St. John's to forego its religious precepts. By relocating St. Johannes Cemetery, St. John's would be "coerced by the Government's action into violating [its] religious beliefs." *Lyng*, 485 U.S. at 449. By forcing St. John's to "perform acts undeniably at odds with fundamental tenets of [its] religious beliefs," this coercion presents the precise "danger to the free exercise of religion that the First Amendment was designed to prevent." *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972).

Because the amendments to the Illinois RFRA offend the Free Exercise Clause, the law must survive strict scrutiny under both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Under strict scrutiny review, the Government bears the burden of proving both that the act in question advances a compelling state interest and that the means chosen to pursue that interest are narrowly tailored to that end. *See Johnson v. California*, 543 U.S. 499, 505 (2005); *see also Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir. 2006); *Vision Church*, 468 F.3d at 996. The majority opinion accepts the City's assertions that the current modernization plan is narrowly tailored. Perhaps the City is correct. However, accepting the City's assertions at this stage in the litigation is inconsistent with our obligation when reviewing a motion to dismiss to accept all well pleaded facts as true and draw all reasonable inferences from those facts in favor of the plaintiffs. *Patel v. City of Chicago*, 383 F.3d 569, 572 (7th Cir. 2004). At this stage in the litigation, there has been none of the factual development necessary to determine whether the means chosen by the City are narrowly tailored to meet the compelling interest asserted here.

Therefore, I would remand the case for further proceedings to allow factual development. For these reasons, I respectfully dissent from the portion of the panel's opinion that rejects St. John's claim. I am pleased to join the opinion in all other respects.

A true Copy:

      Teste:

                   _____

                   *Clerk of the United States Court of Appeals for the Seventh Circuit*